. In re M & L BUSINESS MACHINE COMPANY, INC., Debtor.

**Christine J. JOBIN, Trustee, Plaintiff,**

**v.**

**G. LALAN and J. Lalan, Defendants.**

Bankruptcy No. 90–15491 CEM.
Adv. No. 92–2578 RJB.

United States Bankruptcy Court,
D. Colorado.

Nov. 8, 1993.

**854**

Christine J. Jobin, and Dana M. Arvin, The Jobin Law Firm, P.C., Denver, CO, for plaintiff.

C. Vincent Phelps, Phelps and Associates, Brighton, CO, and Declan J. O'Donnel, Declan O'Donnel, P.C., Englewood, CO, for defendants.

## MEMORANDUM OPINION AND ORDER

ROLAND J. BRUMBAUGH, Bankruptcy Judge.

THIS MATTER came on for trial on October 19, 1993, on the Plaintiff's Complaint. This Court has jurisdiction pursuant to 28 U.S.C. §§ 157(b)(1) and (b)(2)(E), (F), and (H), and 28 U.S.C. § 1334(b). This matter is a core proceeding under 28 U.S.C. § 157. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

The Plaintiff's Complaint seeks to avoid transfers of alleged Debtor's property pursuant to 11 U.S.C. §§ 544, 547, and 548 and for recovery of estate property pursuant to 11 U.S.C. §§ 542 and 550.

*Preference Claim*

The Plaintiff alleges that the Defendant G. Lalan (Gregory Lalan is the "G. Lalan" named as a Defendant herein) received $145,-000 from the Debtor which constitutes a preference under 11 U.S.C. 547(b). To prevail the Plaintiff must prove (1) that the transfer of the $145,000 was for the benefit of a creditor; (2) that it was made on account of an antecedent debt; (3) that it was made while the Debtor was insolvent; (4) that it was within 90 days prior to the Debtor's bankruptcy; and (5) that it enabled the creditor to receive a larger share of the estate than if the transfer had not been made.

The Trustee/Plaintiff was called at trial and submitted her Direct Testimony in sworn written form. (See Exhibit S.) That testimony established elements (2), (3), (4) and (5), *supra.*

E. Jayne MacPhee was also called at trial and testimony established the transfers to G. Lalan and the dates of the transfers. The last folio of Exhibit R shows the summarization of the transfers between G. Lalan and the Debtor. G. Lalan did not dispute that these were the transfers made nor did he dispute the dates of such transfers. The evidence was clear that Defendant G. Lalan received the sum of $145,000 during the preference period.

■ The Defendant asserts that he was not a "creditor" of the Debtor, but was rather a "joint venturer." However, the Defendant produced no evidence to establish this "joint venture" defense. It was incumbent upon the Defendant to do so. *Dime Box Petroleum Corp. v. Louisiana Land and Exploration Co.*, 938 F.2d 1144 (10th Cir.1991).

■ There are three elements the Defendant must prove to establish a joint venture: (1) a joint interest in property or contract rights; (2) an express or implied agreement to share in losses or profits of the venture; and (3) conduct showing cooperation in the venture. The Defendant admitted in his testimony that he had no joint interest in property or contract rights of the Debtor, and that there was no agreement that he would share in any losses of the venture. The

evidence was clear that the Defendant invested money with the Debtor and was immediately given two post-dated checks for each investment transaction—one for his principal investment and one for a fixed return on that investment. He also admitted that this return on investment, or "profit" as he characterized it, was predetermined by Robert Joseph, the principal of the Debtor, by applying a fixed percentage to the amount of his investment—in other words, "interest." Based upon this evidence, the Court finds that Defendant G. Lalan was a "creditor" of the Debtor as that term is used in § 547, and was not a "joint venturer."

■ It was admitted in the Joint Pretrial Statement that Robert Joseph and his henchmen were using the Debtor to engage in a Ponzi scheme and a check kiting scheme. Thus, the "ordinary course of business" defense contained in § 547(C)(2) is not available to the Defendant. See, e.g., *Danning v. Bozek*, 836 F.2d 1214 (9th Cir.1988), *cert. denied*, 486 U.S. 1056, 108 S.Ct. 2824, 100 L.Ed.2d 925 (1988).

■ The Defendant argues that he gave "value" for the transfers he received, apparently asserting the "new value" defense under § 547(c)(4). This defense has been called the "subsequent advance" defense. Court decisions have consistently held that the old "Net Result Rule" or "Net Recovery Rule" no longer has any vitality under the Bankruptcy Code. *In re Electronic Metal Products, Inc.*, 916 F.2d 1502 (10th Cir.1990). Under the "subsequent advance" defense the Court must determine the amount of subsequent advances by the Defendant that can offset previous preferential transfers.

■ The courts are divided, however, in how the calculations must be made in applying the "subsequent advance" defense. A frequently cited method is that found in *Leathers v. Prime Leather Finishes Co.*, 40 B.R. 248 (D.Me.1984). That court found that the proper method was to net the amount of each subsequent advance by the Defendant against the immediately preceding preferential transfer. The next preferential transfer would be netted against the succeeding subsequent advance. There would be no carrying forward of any leftover subsequent advance against the next preferential transfer. In other words, each preference payment and immediately succeeding subsequent advances would be considered in isolation. In contrast, other courts have adopted a modified method. See *In re Thomas W. Garland, Inc.*, 19 B.R. 920 (E.D.Mo.1982). These courts found that during the preference period each dollar of preferential payment may be set off against each dollar of the following subsequent advances, but the setoff may not be greater than dollar for dollar. This Court finds that the *Garland* rule will better serve the purposes of Congress in encouraging creditors to deal with financially troubled businesses. *In re Meredith Manor, Inc.*, 103 B.R. 118 (S.D.W.Va.1989). Unlike the "Net Result Rule", both the *Leathers* and *Garland* methods require that the preferential payments *precede* the offsetting subsequent advances. As a practical matter, the only final difference in the *Garland* method and the "Net Result Rule" is that in the *Garland* method subsequent advances made by a creditor where there are no outstanding net preference payments from the debtor are not protected as far as the creditor is concerned. The following chart illustrates the differences between "*Leathers,*" "*Garland,*" and the "Net Result Rule" as applied in this case:

| Date | Subsequent Advances | Preference Payment | Preference per Leathers | Preference per Garland | Preference per Net Result Rule |
|---|---|---|---|---|---|
| 07/26/90 | | 63,000 | · 63,000 | 63,000 | 63,000 |
| 08/16/90 | 20,000 | | 43,000 | 43,000 | |
| 08/23/90 | 20,000 | | 23,000 | 23,000 | |
| 08/23/90 | | 2,000 | | 25,000 | 65,000 |
| 08/24/90 | | 20,000 | | 45,000 | 85,000 |
| 09/11/90 | 30,000 | | | 15,000 | |
| 09/12/90 | | 24,000 | | 39,000 | 109,000 |

| | | | | | |
|---|---|---|---|---|---|
| 09/25/90 | 30,000 | | | 9,000 | |
| 09/26/90 | | 36,000 | 59,000 | 45,000 | 145,000 |
| Net Recoverable Preference | 100,000 | 145,000 | 59,000 | 45,000 | 45,000 |

Thus, applying the *Garland* method, the Plaintiff is entitled to recover a total of $45,000 as a preference under 11 U.S.C. § 547(b) out of the $145,000 received by the Defendant.

### Fraudulent Transfers

█ The Plaintiff seeks to recover under 11 U.S.C. § 548(a)(1) a total of $409,476 from Defendant G. Lalan. To succeed under that section the Plaintiff must prove: (1) that there was a transfer of an interest of the Debtor in property; (2) that the transfers occurred within one year of the date of the filing of the Debtor's bankruptcy petition; and (3) that the transfers were made with the actual intent to hinder, delay or defraud.

There is no dispute that G. Lalan received $409,476 from the Debtor during the year preceding the Debtor's bankruptcy petition.

Defendant G. Lalan asserts that the funds he received were not property of the Debtor.[1] His argument is as follows. Robert Joseph and his cohorts were engaged in a Ponzi scheme. The only "honest" money the Debtor received during the relevant time period consisted of gross receipts of about $180,000 from the Havana Street store, which receipts were almost immediately hopelessly co-mingled with the funds they received from their fraudulent Ponzi scheme. Under §§ 18–4–401 and 18–4–405, C.R.S., the funds received by the Debtor through the Ponzi scheme were funds obtained by theft and, therefore, these funds never became property of the Debtor, but always remained property of the defrauded victims. And under the state statute, the rightful owners may recover these funds from the thief or from the person in possession thereof. The statutes involved read as follows:

§ 18–4–401. Theft. (1) A person commits theft when he knowingly obtains or exercises control over anything of value of another without authorization, or by threat or deception, and: (a) Intends to deprive the other person permanently of the use or benefit of the thing of value; or (b) Knowingly uses, conceals, or abandons the thing of value in such manner as to deprive the other person permanently of its use or benefit; or (c) Uses, conceals, or abandons the thing of value intending that such use, concealment, or abandonment will deprive the other person permanently of its use and benefit; or (d) Demands any consideration to which he is not legally entitled as a condition of restoring the thing of value to the other person.

§ 18–4–405. Rights in stolen property. All property obtained by theft, robbery, or burglary shall be restored to the owner, and no sale, whether in good faith on the part of the purchaser or not, shall divest the owner of his right to such property. The owner may maintain an action not only against the taker thereof but also against any person in whose possession he finds the property. In any such action, the owner may recover three times the amount of actual damages sustained by him, if any, and may also recover costs of the action and reasonable attorney fees; but treble damages and attorney fees shall not be recoverable from a good-faith purchaser or good-faith holder of the property.

█ It is true that under the Bankruptcy Code, property rights are to be determined by state law. Given that the funds received from investors were funds obtained by "theft" as that term is used in the state

---

1. The Defendant also asserts this defense to the Plaintiff's § 547 claim. The analysis herein under § 548 applies as well because both § 547 and § 548 speak of transfers of an "interest of the debtor in property."

statute, we must still determine whether, at the time the Debtor paid some of those funds to the Defendant herein, such payment was a transfer of an "interest of the debtor in property."

■■■ There is no argument but that the investors gave their money to the Debtor voluntarily. Thus, at the time of each investment, the Debtor had at least the legal right to possession. It is elemental property law that one of the "interests in property" included in the total bundle of property rights is the right of possession. All that § 548 requires is the transfer of an "interest" by the Debtor. True, that interest was subject to defeat by each investor, but it nevertheless was an "interest of the debtor in property." Sections 547 and 548 do not require that the transfers must be of the *title* (legal or equitable) to property of the Debtor, but only of an interest of the debtor in property.

Although not concerned specifically with the Colorado criminal statute asserted here, the District Court, sitting *en banc*, came to the same conclusion in *In re Independent Clearing House Co.*, 77 B.R. 843 at 853–854 (D.Utah 1987), and the cases cited therein.

It is curious that the Defendant here says that the Plaintiff/Trustee cannot recover the property from him because it belongs to the other investors. Yet, by the same state statute he relies upon, he has no legal claim to any of the property because it belongs to the other investors. And, although the Plaintiff is not proceeding under § 18–4–405, C.R.S., on behalf of the other investors, she is attempting to recover the funds for the benefit of *all* of the investors, thus giving effect to the state statutory scheme relied upon by the Defendant.

■■■ If the Defendant claims that some or all of the transfers he received from the Debtor were merely the return of his own funds which the Debtor took by "theft," he has failed in his burden. He has not even attempted to trace his funds through the Debtors accounts and has, in his argument, admitted that his funds (along with the funds of all the other "investors") were hopelessly comingled with the only "honest" money the

Debtor had, i.e., the $180,000 gross receipts from the Havana store.

■■■ The issue of the Debtor's "actual intent" to defraud was dispositively dealt with in *In re Independent Clearing House Co., supra,* i.e., that in a Ponzi scheme the only inference that a court can make is that the Debtor had the requisite intent to hinder, delay or defraud under § 548(a)(1). The Plaintiff having carried her burden under that section, it is incumbent upon the Defendant to establish any defenses thereto.

■■■ As an alternative, the Plaintiff seeks to recover the $409,476 under 11 U.S.C. § 548(a)(2). To prevail on that claim the Plaintiff must prove: (1) a transfer of an interest of the Debtor in property; (2) the transfer must have been made within one year preceding the filing of the Debtor's bankruptcy petition; (3) the Debtor must not have received reasonably equivalent value in exchange for the property transferred; and (4) the Debtor must have been insolvent, or have been made insolvent, by the transfer.

As stated, *supra*, there is no dispute that the Debtor transferred to G. Lalan the sum of $409,476 within one year preceding the filing of the Debtor's bankruptcy petition. The testimony of Ms. MacPhee and of the Trustee clearly established that all during the relevant time period the Debtor was insolvent. Thus, elements 1, 2, and 4 have been established.

The Defendant asserts a defense to the § 548(a)(2) claim under § 548(a)(2)(A), i.e., that the Debtor received "a reasonably equivalent value in exchange for the transfer" and a defense to the § 548(a)(1) and § 548(a)(2) claims under § 548(c), i.e., that he gave "value" "in good faith."

"Value" for purposes of § 548 is specifically defined in § 548(d)(2)(A). As stated by the Court in *In re Independent Clearing House Co., supra:*

> ... to the extent transfers to a defendant did not exceed the amount of the defendant's undertaking, the debtor received a "reasonably equivalent value" for the transfer. The converse is also true: To the extent that a defendant received amounts less than or equal to his under-

taking, he "gave value" to the debtor in exchange for the transfers. The consideration for the transfers was satisfaction of the debt created when the defendant advanced the debtor money or other property ... 77 B.R. 843 at 861.

Here, the Plaintiff's evidence established that during the relevant one year preceding the Debtor's bankruptcy, the Defendant received $409,476, and he invested $355,430, showing that he received $54,046 more than he invested. This Court agrees with the analysis of the court in *In re Independent Clearing House Co., supra,* which decided that for this excess received by an investor in a Ponzi scheme the Debtor does not receive a reasonably equivalent value, nor does the investor give value for this excess.

Here, the Defendant argues, and indeed testified, that he actually gave more to the Debtor than revealed by the Plaintiff. These investments were as follows:

1. November 20, 1989—$5,000 cash.
2. February 7, 1990—$10,000 cash.
3. March 30, 1990—$15,000 cash.
4. May 15, 1990—$4,000 cash.

Neither the Debtor's records, such as they were, nor a thorough analysis of the bank records of the Debtor, revealed any such deposits. The Defendant was asked to produce *any* documentary evidence he had concerning these cash payments such as bank statements showing withdrawals from a bank, etc. He produced none. His only explanation was that he sold some items and used the cash from those sales, but his testimony in this regard was hazy at best and evasive at worst. It is incumbent upon the Defendant to prove that he "gave value" and that the Debtor "received reasonably equivalent value." Thus, the Plaintiff has prevailed on her claim that the Defendant received $54,046 in excess of the amount of his payments to the Debtor under § 548(a)(1).

However, to have a defense under § 548(c), and therefore under § 548(a)(2), the Defendant must also show his good faith. This Court adopts the standard of "objective" good faith rather than "subjective" good faith. *See Chorost v.*

*Grand Rapids Factory Showrooms,* 77 F.Supp. 276 (D.C.N.J.1948); *In re Agricultural Research and Technology Group,* 916 F.2d 528 (9th Cir.1990).

Gregory Lalan, who is the "G. Lalan" named as a Defendant herein, has owned a dry cleaning business since 1975. In 1975 he obtained a business loan secured by the business, i.e., a line of credit, but he never drew down on that line. At one time he had a loan on his residence, but paid that off in 1988. He has also had a car loan at current interest rates. Prior to 1990 he testified that he had paid as high as 12% interest on loans. Yet the returns he received from his payments to the Debtor ranged from 125% to 512% on an annualized basis.

Prior to his involvement with the Debtor he had purchased stock of Public Service Co. and of Chrysler Corp. in the 1970s. He still has the Chrysler stock. He also invested and lost money in the penny stock market.

In the summer of 1989, his friend, Mark Euler, told him about investment opportunities available with the Debtor. But, as he testified, he discounted what Euler told him because "there was no way to make money that quick without a catch." Later Euler told him that Euler's accountant had checked out the Debtor through Dun & Bradstreet. So he went to Robert Joseph's office in October 1989 with $10,000 cash. Joseph had told him that the minimum investment was $10,000 and the first investment had to be in cash. Lalan did not ask to see any of the alleged contracts he was investing in; did not ask for financial records; did not ask about assets and liabilities of the Debtor; and did not ask who the accountants were for the Debtor. He did not ask for any written financial information. Whenever he did ask Joseph any pertinent questions, Joseph would be evasive or put him off. Lalan never pressed the matter.

Prior to making any investment he never spoke to an attorney, a stock broker, or an accountant. Joseph told him that the owner of a Chevrolet dealer in Broomfield, Colorado, was an investor and that he always kept a "heavy balance" with the Debtor—never below $50,000. However, Lalan never did any-

thing to verify this statement. Instead, he testified, that he relied on the advice of Euler and another friend, Brad Rusic. He said the he has always respected their business ability. However, he gave the Court not one shred of evidence as to who these two friends were, what their backgrounds are, their education, or their business experience. This Court has no idea if Lalan had any reasonable reason for relying on their representations. In fact, Lalan admitted that his friends "didn't know too much about it at the time."

In addition, Lalan testified that part of his deal with Joseph was that whenever he invested money in the Debtor, Joseph would immediately give him two post-dated checks—one for his principal investment, and one for his profit. He testified that it was always his understanding that he faced no risk, even if the contracts he was supposedly investing in fell through. However, Lalan was not allowed to cash these checks on the dates they matured. First he had to physically come to Joseph's office in Boulder, Colorado (Lalan lives and works in Brighton, Colorado), and receive Joseph's permission to negotiate the checks. Sometimes that permission was not given, but he was told to hang on to the checks a few more days. He even admitted that *he* became suspicious after about six months, yet he continued to play the game to the tune of about $300,000 and made no inquiries.

These facts do not show that Lalan was operating with good faith. He ignored his own initial intuition and plunged headlong into the scam because of the huge profits he was promised, and which he received. Is it reasonable to expect profits of 125% to 512%? Especially when there is supposedly "no risk" for the investment? Is it reasonable to expect a legitimate business to demand cash for an investment—at a minimum of $10,000? Is it reasonable to hand over that amount of cash without at least some investigation? Is it reasonable to accept post-dated checks for large sums of money from a person, but not be able to negotiate such checks on their due dates until permission from the maker is received? Is it reasonable for an investor to be required to physically travel to another town to obtain that permission? Is it reasonable to continue this activity and invest approximately $300,000 with no further investigation even after a person becomes suspicious? The answer to all these questions is a resounding NO! The Defendant has failed, by a wide margin, to establish a good faith defense under § 548(c). Therefore, under § 548(a)(2), the Plaintiff is entitled to recover the full amount of the fraudulent transfers to this Defendant that occurred within one year preceding the Debtor's bankruptcy, or $409,476.

The Defendant also asserts many other defenses, i.e., accord and satisfaction, failure of consideration, payment and release, estoppel or promissory estoppel, and waiver by Plaintiff. There was no evidence or argument presented by the Defendant relating to these defenses and they are discarded.

There was no evidence presented concerning Defendant "J. Lalan" and, therefore, the Court will dismiss the Complaint as to that Defendant. It is, therefore,

ORDERED that judgment shall enter in favor of the Plaintiff Trustee and against the Defendant Gregory Lalan in the sum of $45,000 under 11 U.S.C. § 547(b). It is

FURTHER ORDERED that judgment shall enter in favor of the Plaintiff Trustee and against Defendant Gregory Lalan in the sum of $54,046 under 11 U.S.C. § 548(a)(1). It is

FURTHER ORDERED that judgment shall enter in favor of the Plaintiff Trustee and against Defendant Gregory Lalan in the sum of $409,476 under 11 U.S.C. § 548(a)(2). It is

FURTHER ORDERED that the judgments ordered herein are duplicative and overlapping and that the Plaintiff Trustee shall have and recover from the Defendant Gregory Lalan only a total of $409,476, plus costs of suit, plus interest at the statutory rate from and after entry of judgment herein. It is

FURTHER ORDERED that the Complaint herein is dismissed as to Defendant J. Lalan.