**In re HEDGED–INVESTMENTS ASSOCIATES, INC., Debtor.**

**Harvey SENDER, Trustee, Plaintiff,**

v.

**Estill H. BUCHANAN, et al., Defendants.**

Bankruptcy No. 90–14149 PAC.
Adv. No. 92–2092 RJB.

United States Bankruptcy Court,
D. Colorado.

Feb. 2, 1994.

Melody Dawson and John Wasserman, Katch, Sender & Wasserman, P.C., Denver, CO, for plaintiff.

Bruce E. Rhode, Davis & Ceriani, P.C., Denver, CO, for defendants.

MEMORANDUM OPINION AND ORDER

ROLAND J. BRUMBAUGH, Bankruptcy Judge.

THIS MATTER came on for trial on December 7, 1993, on the Plaintiff's Amended Complaint under 11 U.S.C. §§ 547(b), 548(a)(2), and under C.R.S. § 7–62–101, *et seq.,* the Colorado Uniform Limited Partnership Act ("CULPA").

Plaintiff alleges that this Court has jurisdiction over this action under 28 U.S.C. §§ 1334 and 157. He also asserts that this is a core proceeding under 28 U.S.C. § 157(b)(2)(H) and that venue is proper pursuant to 28 U.S.C. § 1409(a). The parties stipulated in the Amended Joint Pre–Trial Statement and Order filed October 12, 1993, that this Court has jurisdiction under 28 U.S.C. §§ 1334 and 157, and the Court finds that it has jurisdiction under those sections. However, the Defendant denies that the

Third Claim for Relief under CULPA is a core proceeding and does not consent to entry of a final judgment by this Court on that claim.

■ The Court agrees that the claim under CULPA is not a core proceeding, but is a "related" matter much akin to the straightforward state law contract actions to collect pre-petition account receivables dealt with in *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982). Although this is a statutory action, it arises from the pre-petition limited partnership agreement between the Debtor and the Defendant. The issues involved are all pure state law issues, and the matter would not be before this Court absent the pending bankruptcy. Therefore, any findings and conclusions of this Court on the Plaintiff's claims under CULPA will be "proposed" findings and conclusions under 28 U.S.C. § 157(c)(1). The other claims under 11 U.S.C. §§ 547 and 548 are "core" matters and this Court will enter final judgment on those claims.

Sometime prior to 1978, James D. Donahue ("Donahue") formed a Colorado corporation, Hedged–Investments Associates, Inc. ("HIA, Inc."), in which he was the sole shareholder and sole director. Thereafter, he formed Colorado limited partnerships Hedged–Investments Associates, L.P. ("HIA–1"), Hedged–Investments Associates II, L.P. ("HIA–2"), and Hedged–Securities Associates, L.P. ("HSA"). HIA, Inc., was the corporate managing general partner of HSA (see Exhibit SS, Certificate of Limited Partnership). Donahue was the managing general partner of HIA–1 shown on a partnership agreement dated April 1, 1979 (see Exhibit C), but HIA, Inc., was the general partner shown on a partnership agreement dated January 1, 1978 (See Exhibit H). There was no Certificate of Limited Partnership introduced for HIA–1, although there was an Amended Certificate of Limited Partnership dated January 2, 1980 (Exhibit G), which showed HIA, Inc., and M & B Investment Company as General Partners. There was no evidence as to the identity of the managing general partner for HIA–2. The purpose of the limited partnerships was to invest in stocks, options, and other similar transactions.

When parties invested in HIA–1 they became limited partners of that entity. None of the partnerships maintained a bank account. Instead, all investments of the partnerships, whether in the form of cash infusions from the limited partners, or profits on stock transactions, were held in the name of HIA, Inc., or in "street name" for the account of HIA, Inc. All cash transactions for the partnerships were conducted through the bank account held in the name of HIA, Inc., including any payments made to or by the limited partners. The Plaintiff's expert, Leslie A. Patten, performed a financial reconstruction of Donahue's activities because, in his words, "... no evidence was found of any 'normal' accounting records for [HIA, Inc.], such as a general ledger, subsidiary receivable and payable ledgers or reconciliations of bank and brokerage statements." (Exhibit HH, unnumbered vol. p. 2.) During that reconstruction, Mr. Patten stated, "It is important to note that investor funds were entirely commingled in the [HIA, Inc.] bank and brokerage house accounts, thus rendering the assignment of trading gains and losses on a basis of specific funds tracing impossible with a few specific exceptions. This is significant, as the ultimate allocation to investors of trading gains and losses, as well as of any other gains and losses, was, by necessity, *done on an aggregate pooled basis* [emphasis added], but within the context of legal partnership structures." (Exhibit HH, unnumbered vol. p. 10).

Regardless of the legal entity involved, Donahue was the sole person who directed all activities for HIA, Inc., and each of the partnerships. He was in complete control of each entity and the assets of each entity. He ignored all legal distinctions regarding the various entities, and hopelessly commingled all of the assets into one amorphous pot. He even ignored the specific language in the partnership agreement for HIA–1 which provided that he, personally, was the general partner, who, according to Art. I, ¶ 8, could not assign his interests in the partnership (See Exhibit C—Agreement of Limited Partnership). Yet in his deposition taken Febru-

ary 18, 1993, he testified that HIA, Inc., was the corporate managing general partner of HIA–1 from its inception (see Deposition p. 20, lines 10–15).

Through the years beginning in April 1978, the Defendant Buchanan, acting for herself, and as trustee for her own trust and as custodian for her children, began investing with Donahue. She treated all of the various accounts as her own and freely transferred funds between and among the various accounts. She believed that she was a limited partner in HIA–1. Exhibit II shows the activity in each of the accounts Defendant controlled as follows:

| Estill H. Buchanan/Cusd. for Eugene Buchanan | | | | |
|---|---|---|---|---|
| Date | Cash Additions | Transfers In | Cash Withdrawals | Transfers Out |
| 04/10/78 | 5,000.00 | | | |
| 10/13/78 | 50,000.00 | | | |
| 04/10/79 | | | 2,782.00 | |
| 12/25/79 | | | | 17,895.25 |
| 01/14/80 | | | 12,500.00 | |
| 01/16/80 | | | 12,500.88 | |
| 05/07/80 | | | 7,500.00 | |
| 07/02/80 | | | 2,352.10 | |
| 12/25/81 | | | | 33,198.00 |
| 12/25/85 | | 20,000.00 | | |
| 01/01/87 | | | | 18,923.02 |
| 04/22/88 | | | 2,128.34 | |
| 01/01/89 | | | 2,053.42 | |
| 03/31/89 | | | 10,480.10 | |
| Total | 55,000.00 | 20,000.00 | 52,296.84 | 70,016.27 |
| Net Cumulative Investment | | | | −47,313.11 |

| Estill H. Buchanan/Cusd. for Catharine Buchanan | | | | |
|---|---|---|---|---|
| Date | Cash Additions | Transfers In | Cash Withdrawals | Transfers Out |
| 04/10/78 | 5,000.00 | | | |
| 10/13/78 | 50,000.00 | | | |
| 04/10/79 | | | 2,782.00 | |
| 12/25/79 | | | | 17,895.25 |
| 01/14/80 | | | 12,500.00 | |
| 01/16/80 | | | 12,500.87 | |
| 05/07/80 | | | 7,500.00 | |
| 07/02/80 | | | 2,352.12 | |
| 12/25/81 | | | | 33,198.00 |
| 12/25/84 | | 53,000.00 | | |
| 12/25/85 | | 10,000.00 | | |
| 12/25/86 | | | | 60,503.00 |
| 01/01/87 | | | | 18,923.02 |
| 07/01/87 | | 5,000.00 | | |
| 07/01/87 | | | 1,346.78 | |
| 04/01/88 | | | 2,466.70 | |
| 04/01/88 | | | 916.92 | |
| 07/01/88 | | | 744.16 | |
| 04/01/89 | | | 872.95 | |
| 07/01/89 | | | 896.02 | |
| 04/01/90 | | | 757.27 | |
| Total | 55,000.00 | 68,000.00 | 45,635.79 | 130,519.27 |
| Net Cumulative Investment | | | | −53,155.06 |

| Estill H. Buchanan/Cusd. Helen | | | | |
|---|---|---|---|---|
| Date | Cash Additions | Transfers In | Cash Withdrawals | Transfers Out |
| 01/10/78 | 50,000.00 | | | |
| 04/10/78 | 5,000.00 | | | |
| 12/25/79 | | | | 67,895.25 |
| 12/25/85 | | 20,000.00 | | |
| 01/01/87 | | | | 18,923.02 |
| 07/01/87 | | | 1,346.78 | |
| 01/01/89 | | | 12,698.74 | |
| Total | 55,000.00 | 20,000.00 | 14,045.52 | 86,818.27 |
| Net Cumulative Investment | | | | −25,863.79 |

| Estill H. Buchanan/Cusd. for Bruce Buchanan | | | | |
|---|---|---|---|---|
| Date | Cash Additions | Transfers In | Cash Withdrawals | Transfers Out |
| 01/10/78 | 50,000.00 | | | |
| 04/10/78 | 5,000.00 | | | |
| 12/25/79 | | | | 67,895.25 |
| 12/25/84 | | 53,000.00 | | |
| 12/25/85 | | 10,000.00 | | |
| 12/25/86 | | 10,000.00 | | |
| 07/01/87 | | | | 5,000.00 |
| 04/01/88 | | | 7,591.77 | |
| 04/01/88 | | | 23,917.19 | |
| 07/01/88 | | | 5,962.94 | |
| 01/01/89 | | | 16,677.63 | |
| 04/01/89 | | | 6,001.20 | |
| 07/01/89 | | | 6,159.80 | |
| 01/01/90 | | | 5,324.48 | |
| 04/01/90 | | | 4,946.49 | |
| Total | 55,000.00 | 73,000.00 | 76,581.50 | 72,895.25 |
| Net Cumulative Investment | | | | − 21,476.75 |

| Estill H. Buchanan | | | |
|---|---|---|---|
| Date | Cash Additions | Transfers In | Cash Withdrawals | Transfers Out |
| 04/10/79 | | . | 9,549.51 | |
| 04/12/79 | | | 1,581.56 | |
| 07/09/79 | 100,000.00 | | | |
| 12/25/79 | | 171,581.00 | | |
| 07/02/80 | | | 21,272.04 | |
| 12/25/80 | | | | 49,619.00 |
| 04/10/81 | 31,000.00 | | | |
| 12/25/81 | | 66,396.00 | | |
| 06/16/82 | | | 16,500.00 | . |
| 12/25/82 | | 71,703.00 | | . |
| 12/25/82 | | | 14,000.00 | |
| 12/25/82 | | | | 38,500.00 |
| 04/08/83 | 15,000.00 | | | |
| 04/15/83 | | | 4,702.00 | |
| 12/25/83 | | 104,708.00 | | |
| 08/24/84 | | | 55,000.00 | |
| 12/25/84 | | 11,664.00 | . | |
| 07/03/85 | | . | 12,000.00 | |
| 12/25/85 | | | | 93,046.00 |
| 12/25/86 | | 122,075.00 | | |
| 01/01/87 | | 40,353.00 | . | |
| 01/01/87 | | 56,769.06 | | |
| 07/01/87 | | 79,854.00 | | |
| 02/04/88 | | | 300,000.00 | |
| 02/19/88 | | | 33,105.00 | |
| 04/01/88 | | | 104,419.07 | |
| 06/14/88 | | | 25,000.00 | |
| 07/01/88 | | | 92,850.16 | |
| 07/01/88 | | | | 76,531.00 |
| 10/01/88 | | | 94,342.61 | |
| 10/01/88 | | | | 94,342.61 |
| 01/01/89 | | | 79,991.37 | |
| 01/10/89 | | . | | 79,991.37 |
| 04/01/89 | | | 81,136.61 | |
| 07/01/89 | | | 83,280.88 | |
| 01/01/90 | | | 71,987.36 | |
| 04/01/90 | | | 66,876.80 | |
| Total | 146,000.00 | 725,103.06 | 1,167,594.97 | 432,029.98 |
| Net Cumulative Investment | | | | −728,521.89 |

| Estill Buchanan Trust | | | | |
|---|---|---|---|---|
| Date | Cash Additions | Transfers In | Cash Withdrawals | Transfers Out |
| 04/12/79 | 200,000.00 | | | |
| 10/08/79 | | | 45,236.43 | |
| 01/15/80 | | | 3,325.24 | |
| 03/25/80 | 41,911.00 | | | |
| 07/02/80 | 45,000.00 | | | |
| 12/25/80 | | 49,619.00 | | |
| 04/13/81 | | | 24,000.00 | |
| 04/13/82 | | | 2,050.00 | |
| 12/25/82 | | 38,500.00 | | |
| 12/25/82 | | | | 71,703.00 |
| 04/08/83 | 65,000.00 | | | |
| 12/25/83 | | | | 104,708.00 |
| 12/25/84 | | | | 117,664.00 |
| 04/19/85 | 33,000.00 | | | |
| 12/25/85 | | 13,046.00 | | |
| 12/25/86 | | | | 47,758.00 |
| 01/01/87 | | | | 40,353.00 |
| 07/01/87 | | | | 79,854.00 |
| 04/01/88 | | | 52,407.19 | |
| 04/22/88 | | | 169,598.00 | |
| 07/01/88 | | 76,531.00 | | |
| 07/01/88 | | | 43,048.82 | |
| 10/01/88 | | 94,342.61 | | |
| 01/01/89 | | 79,991.37 | | |
| 01/01/89 | | | 97,992.30 | |
| 04/01/89 | | | 57,847.09 | |
| 07/01/89 | | | 59,375.87 | |
| 01/01/90 | | | 51,324.05 | |
| 04/01/90 | | | 47,680.43 | |
| Total | 384,911.00 | 352,029.98 | 653,885.42 | 462,040.00 |
| Net Cumulative Investment | | | | − 378,984.44 |

Thus, for all accounts the Defendant controlled from January 10, 1978, through April 1, 1990, she received a total of $1,259,129.04 more in cash than she invested in cash.

All of the Defendant's investment money was put directly into the bank account in the name of HIA, Inc., and all payments she received were paid from this same account.

When Donahue convinced parties to invest in these various entities he indicated they could expect returns of 15% to 22% on their investments. Mr. Patten testified that Donahue was never able to achieve these returns. He also stated in his report, "[O]n a cash basis, as of the end of March 1980 and every month thereafter, there was a deficiency of assets available to [HIA, Inc.] to meet the obligations owing to the investors. On an allocated trade basis, as of the end of September 1978 and every month thereafter, there was a deficiency of assets available to [HIA, Inc.] to meet the obligations owing to the investors." (Exhibit HH, unnumbered vol. pp. 11–12.)

Mr. Patten also stated that "[I]t should be noted that, as of the end of 1982 and every year end thereafter, cumulative trading loses exceed cumulative trading gains." (Exhibit HH, unnumbered vol. p. 12.) Thus, Donahue was able to make a profit on his trading activity (although not the size of profits he forecast or that he reported to the investors), on a cumulative basis, up to the end of 1982, but was in a deficit position, *in his trading activity*, from that point forward.

His position with investors, however, was not as rosy. This was because he issued false reports to the investors which contained inflated profits. The investors would then withdraw funds from their accounts based on the false accounts, and in the case of this Defendant, pay taxes on those fictitious gains. The result was that, after assigning ("on an aggregate pooled basis") the gains and losses on trading activity to each individual investor's account, many investors were "overdrawn." Where did Donahue get the cash to pay for these investor withdrawals? He got it from new investors. The result was that as of the end of September 1978, HIA, Inc., was insolvent and Donahue was engaged in a "Ponzi" scheme.[1]

On August 30, 1990, HIA, Inc., filed a voluntary Chapter 11 petition. The case was converted to Chapter 7 on September 7, 1990. The Plaintiff herein was appointed Trustee on September 7, 1990. On September 28, 1990, the Plaintiff filed an involuntary Chapter 7 petition against HSA. On October 3, 1990, the Plaintiff filed involuntary Chapter 7 petitions against HIA–1 and HIA–2. After orders for relief had entered on the involuntary petitions, all four of these cases were ordered to be jointly administered on December 22, 1990, and the Plaintiff was appointed as Trustee in each case.

On September 3, 1991, the Plaintiff, as Trustee, filed an amended motion to substantively consolidate the cases of the three limited partnerships. (In his original motion to consolidate he had requested that HIA, Inc., also be consolidated with the three limited partnerships.) The Plaintiff's grounds for his amended motion were his expert's "determination that, while multiple partnerships may or may not have been formally created and existed, the composition of each was fluid based upon the actions of the principle [sic] of the general partner, Mr. James Donahue. For example, while an individual partner may have been a member of a specific partnership at the time of initially joining, in numerous instances subsequent payments and tax returns or forms indicated a membership in an entirely different partnership

entity. No separate partnership accounting records exist (as distinguished from the corporate records) and it is not economically feasible or reasonable to attempt to reconstruct such records. The existence of separate partnerships is simply not supportable based upon the records and information available."

Further, the Plaintiff alleged in his amended motion that "the substantive considerations in this matter fall within the parameters of *Chemical Bank New York Trust Company v. Kheel,* 369 F.2d 845 (1966). There, the Second Circuit Court of Appeals held that where eight separate corporations in Chapter 7 proceedings had all been owned or controlled by one person, operated as a single unit with little or no attention to formalities of separate corporations, and where the interrelationship of the group was hopelessly obscured so that the time and expense to even attempt to unscramble them was so substantial as to threaten any recovery for all creditors, the consolidation of the administration of the debtors and the merger of the assets and liabilities for liquidation was proper.... The commingling of the partnerships, the transfer by Mr. Donahue of partners from partnership to partnership and the nature of the business engaged in (stock option strategies) renders any attempt to separate the entities' assets or liabilities at this point futile." That amended motion was granted on September 30, 1991.

Based upon the Plaintiff's own expert's report and his testimony at trial herein, this Court sees no logical reason why the corporate case of HIA, Inc., was not also substantively consolidated with the cases for the limited partnerships for purposes of bankruptcy. Donahue ignored all legal lines in his operation. He treated all funds and investments in his control as one piggy bank with which he could play as he chose, when he chose. It is obvious that he only used the vehicle of the limited partnerships to recruit investors and obtain their cash. In effect, he kept two sets of books—the actual checking account and brokerage accounts in the name of HIA, Inc., and "records of account" for

---

1. For a description of "Ponzi" schemes and their history see *In re Universal Clearing House Com-* *pany,* 41 B.R. 985 (Bankr.D.Utah 1984), footnote 12.

each investor from which he prepared his fictitious reports of profits and Schedule K–1's for the investors to use in preparing their individual tax returns.

■ Throughout this trial both the Plaintiff and the Defendant have vacillated between the position that the partnerships are separate legal entities from HIA, Inc., and the position that all four entities should be treated as one "pool" and the formal legal entities should be disregarded. The facts have clearly shown that Donahue used the limited partnerships solely as his vehicle to obtain the money of the investors for his Ponzi scheme, that he commingled all of the funds that came into HIA, Inc., and that he completely ignored all the legal forms of the partnerships. That does not mean that the limited partnerships, as legal entities, should be disregarded. Under both § 547(b) and § 548(a)(2), the Plaintiff must prove that the "debtor" was insolvent at the time of the transfers to the Defendant. The Plaintiff, as Trustee for all the legal entities involved, has during the trial, as stated *supra*, sometimes blurred the distinction between the various entities. However, in his pleadings and in the Joint Pre–Trial Statement and Order, it is clear that as to the preference and fraudulent transfer actions the "debtor" is HIA, Inc. In his third claim for relief the Plaintiff is apparently wearing a different hat, i.e., he is acting as Trustee for HIA–1.

### Preference Claims

Under § 547(b) the Plaintiff must prove that there was a transfer of an interest of the debtor (HIA, Inc.) in property

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—(A) on or within 90 days before the date of the filing of the petition; or (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title; (B) the transfer had not been made; and (C) such creditor received payment of such debt to the extent provided by the provisions of this title. 11 U.S.C. § 547(b).

The first issue is whether the payments to Defendant were transfers of an interest of HIA, Inc., in property. The parties agree that all of the transfers to Defendant were from a checking account in the name of HIA, Inc.

Not all of the money in that account came from Defendant. Indeed, not all of the money came from the totality of the limited partners in all the limited partnerships. The evidence showed that some of the money came from actual profits Donahue generated in the stock market. Some came from some singularly large investors, e.g., Weyerhaeuser Corporation, who invested with Donahue on their own accounts without going through a limited partnership. The parties each argued that the burden of tracing funds into and out of that HIA, Inc., checking account and the various brokerage accounts should rest with the other.

■ But all of those arguments miss the mark. As pointed out in *Jobin v. Lalan*, 160 B.R. 851 (Bankr.D.Colo.1993), which was another Ponzi scheme case, the debtor came into possession of all of these funds by the voluntary payment of the investors. Thus, the debtor had at least the legal right to possession. It is elemental property law that one of the "interests in property" included in the total bundle of property rights is the right of possession. All that §§ 547 and 548 require is a transfer of an "interest" by the debtor. True, that interest was subject to defeat by each investor, but it nevertheless was an "interest of the debtor in property." As the Supreme Court put it in the original Ponzi case: "Ponzi then had a defeasible title to the money he had received from them [the investors or lenders], and could legally withdraw it." *Cunningham v. Brown, et al.*, 265 U.S. 1 at 12, 44 S.Ct. 424 at 427, 68 L.Ed. 873 (1924). These sections of the Bankruptcy Code do not require that the transfers must be of the *title* (legal or equitable) to the property of the debtor, but only of an inter-

est of the debtor in property. Thus, for these purposes, the transfers herein were transfers of an interest of HIA, Inc., in property.

■ Nevertheless, the Court also finds that the funds in the HIA, Inc., checking account from which the Defendant was paid were property of the Debtor. Defendant argues that the result of the limited partnership arrangement was that all funds deposited by investors in the HIA, Inc., account were held by HIA, Inc., as general partner, in trust for the limited partners, and since the funds in that account were commingled with other funds, e.g., Weyerhaeuser Corporation funds, under Colorado law it is up to the Plaintiff to trace the funds in order to prove they were funds of HIA, Inc., the general partner.

■ As pointed out by the Plaintiff, Colorado recognizes only three types of Trusts— express, constructive, and resulting. This certainly was not an express trust. There is no trust agreement in evidence.

■ A resulting trust carries into effect the intentions of the parties, while a constructive trust defeats the intent of one of them. *First National Bank of Denver v. Harry W. Rabb Foundation*, 29 Colo.App. 34, 479 P.2d 986 (Colo.App.1970). A constructive trust is a fraud-rectifying trust, and a resulting trust is an intent-enforcing trust. *In re Marriage of Heinzman*, 198 Colo. 36, 596 P.2d 61 (App.1979). Because Donahue was engaged in a Ponzi scheme, it is obvious that fraud was his intention. Even though the limited partners may have intended that all funds given to Donahue would be held in trust for their benefit, it was not Donahue's intent. Thus, this "trust" could not have been a resulting trust, but rather could only be a constructive trust. Since the very first Ponzi case, *Cunningham v. Brown, et al., supra*, it has been held that under these circumstances, it is up to the party claiming the existence of a trust to trace his funds—it is not up to the Trustee to perform that tracing. The evidence is abundantly clear and uncontroverted that these funds cannot be traced. Therefore, the funds were property of HIA, Inc.

■ Were these transfers to or for the benefit of a creditor? The parties in their Joint Pre–Trial Statement and Order agree that "All transfers were for the benefit of Defendants." In addition, the Defendant has admitted that she is a creditor by filing proofs of claim in the bankruptcy estate of HIA, Inc., totaling $2,601,545.14.

■ Likewise, the limited partnerships, as legal entities, were creditors of HIA, Inc., the general partner. Why? It was the money of the limited partners of these partnerships that HIA, Inc., took and used in Donahue's enterprise. Instead of reporting the true facts to the partners, he allowed partners to withdraw funds from their accounts to which they were not entitled under the partnership agreements. And after September 1978, there were insufficient assets to meet all that was owed to the partnerships, and thus to the partners. When he solicited and accepted new investments after that date, he did so fraudulently. Thus, any investment made after September 1978 was obtained by fraud and gave rise to a claim by the limited partnerships, thus making these limited partnerships creditors of HIA, Inc.

■ Did the Defendant receive more from HIA, Inc., than she would have received in Chapter 7? The evidence is clear that she did. The testimony of Mr. Patten was that creditors will receive between $20 and $30 million on total claims of approximately $400 million. It appears that the creditors will receive only about 10–20% of their claims. Here, the Defendant has already received more than $1.2 million in excess of her investment.

11 U.S.C. § 547(b) also requires that the Plaintiff show that the payments from HIA, Inc., were made (A) on or within 90 days prior to the bankruptcy; or (B) between 90 days and one year prior to the bankruptcy if the creditor at the time of the payments was an insider. The bankruptcy petition for HIA, Inc., was filed August 30, 1990.

■ The Plaintiff asserts the limited partnerships were "creditors" of HIA, Inc., and that under 11 U.S.C. § 101(31)(B)(iv) the limited partnerships were "insiders" of HIA,

Inc. Further, it is asserted, the payments to Defendant were transfers to or for the benefit of the limited partnerships. Thus, Plaintiff attempts to gain the one-year look back period under § 547. In this case the limited partnerships were creditors of HIA, Inc., and payments here to Defendant were transfers for the benefit of an "insider." Thus, the Plaintiff is not limited to the 90–day look back period of § 547(b)(5)(A), but is entitled to a one-year look back period to August 30, 1989. As Exhibit II shows, The Defendant received the following sums from and after August 30, *1989:*

| 1/1/90 | As Custodian for Bruce | $ 5,324.48 |
|---|---|---|
| 1/1/90 | Personally | 71,987.36 |
| 1/1/90 | As Trustee for Personal Trust | 51,324.05 |
| 4/1/90 | As Custodian for Catharine | 757.27 |
| 4/1/90 | As Custodian for Bruce | 4,946.49 |
| 4/1/90 | Personally | 66,876.80 |
| 4/1/90 | As Trustee for Personal Trust | 47,680.43 |
| | Total | $248,896.88 |

■ Defendant asserts a defense under § 547(c)(2)—the ordinary course of business defense. But this was a Ponzi scheme. In such circumstances the ordinary course of business defense is not available to these investors. See, e.g., *Danning v. Bozek*, 836 F.2d 1214 (9th Cir.1988), *cert. denied*, 486 U.S. 1056, 108 S.Ct. 2824, 100 L.Ed.2d 925 (1988); *Wider v. Wootton*, 907 F.2d 570 (5th Cir.1990).

■ Defendant asserts a defense under § 547(c)(4)—the new value defense. Under this defense the Court must determine the amount of subsequent advances by the Defendant that can offset previous preferential transfers. For the method of calculation to be used see *Jobin v. Lalan, supra.* In the instant case the Defendant made *no* subsequent advances to the Debtor. The Defendant argues that the limited partnerships made such subsequent advances. The new value defense is unique to the specific creditor involved, here the Defendant. The Defendant cannot claim that because *other* creditors made advances to the Debtor subsequent to the transfers she received, she gets the benefit of those subsequent advances under § 547(c)(4). She has, in fact, already received the benefit of the cold, hard cash advanced by those other creditors.

■ Defendant makes much of the fact that Donahue was not particularly scrupulous in his formation of the three partnerships and in keeping them legally and factually separate. She asserts that HIA–1 ceased to exist by its own terms and that Donahue's efforts to "rename" HIA–1 to HSA were ineffective. Therefore, she asserts that she was never a partner in HSA. However, the evidence showed that she executed a power of attorney for Donahue to use to do what was necessary to keep the partnership going. And, more importantly, she accepted the benefits of Donahue's efforts. Year after year she continued to deal with Donahue as if HIA–1 was still viable. She continued to invest funds with Donahue and to accept payments (as late as April 1, 1990) from him in the name of HIA–1. She cannot now be heard to assert that HIA–1 does not exist or that she is not a limited partner of HSA, the intended new name for HIA–1. Therefore, the Plaintiff has met his burden under 11 U.S.C. § 547(b) and is entitled to judgment in the total sum of $248,896.88.

### Fraudulent Conveyance Claims

Under 11 U.S.C. § 548(a)(2) the Plaintiff must prove that there was a transfer of an interest of the debtor (HIA, Inc.) in property within one year prior to the bankruptcy where the debtor

(A) received less than a reasonably equivalent value in exchange for such transfer; and

(B)(i) was insolvent on the date that such transfer was made ... 11 U.S.C. § 548(a)(2).

The issue of whether the payments received by the Defendant were transfers of an interest of the Debtor in property has been discussed, *supra*, and the Court finds that these payments were transfers of property of the Debtor. The Court has likewise already determined, *supra*, that the Debtor was insolvent as of the end of as of the end of September 1978 and, according to the testimony of Mr. Patten, remained so until it filed its bankruptcy petition. The Court has already determined, *supra*, that during this one-year period the Defendant received transfers totaling $248,896.88.

■ Defendant argues that she gave the reasonably equivalent value to the Debtor for these transfers. "Value" for purposes of § 548 is specifically defined in § 548(d)(2)(A). As stated by the Court in *In re Independent Clearing House Co.*, 77 B.R. 843 at 861 (Bankr.D.Utah 1987):

... to the extent transfers to a defendant did not exceed the amount of the defendant's undertaking, the debtor received a "reasonably equivalent value" for the transfer. The converse is also true: To the extent that a defendant received amounts less than or equal to his undertaking, he "gave value" to the debtor in exchange for the transfers. The consideration for the transfers was satisfaction of the debt created when the defendant advanced the debtor money or other property....

Here, the evidence established that during the relevant one year preceding the Debtor's bankruptcy, the Defendant received $248,-896.88, and she invested not one red cent during that time period. Up to the beginning of the one-year period, she had invested a total of $750,911.00 in cash and had already received $1,761,143 in cash—over $1 million more than she invested. It is ludicrous for her to now argue that she gave the reasonably equivalent value for the sums received during the one-year period. Therefore, the Plaintiff has met his burden under 11 U.S.C. § 548(a)(2) and is entitled to judgment in the total sum of $248,896.88.

### CULPA Claim

The Defendant first asserts that the Plaintiff/Trustee has no standing to bring this claim because the limited partnerships should not be in bankruptcy in the first place. She makes this assertion because she claims the Plaintiff had no authority to file the bankruptcy petitions. This amounts to a collateral attack on the orders for relief allowing the involuntary petitions of the partnerships, and this Court will not allow such an attack.

The Plaintiff, as Trustee for HIA–1, seeks to recover from Defendant under C.R.S. § 7–62–608(2) which provides:

If a partner has received the return of any part of his contribution in violation of the partnership agreement or this article, he is liable to the limited partnership for a period of six years thereafter for the amount or the contribution wrongfully returned.

The Plaintiff alleges that payments made to Defendant violated CULPA, specifically C.R.S. § 7–62–607, which reads:

A partner may not receive a distribution from a limited partnership to the extent that, after giving effect to the distribution, all liabilities of the limited partnership, *other than liabilities to partners on account of their partnership interests,* exceed the fair value of the partnership assets. [Emphasis added].

It must be noted that the Plaintiff does not assert a violation of the partnership agreement as a basis for recovery under C.R.S. § 7–62–608(2), but only a violation of C.R.S. § 7–62–607. Nor does the Plaintiff assert any cause of action under the Colorado Uniform Limited Partnership Law of 1931, C.R.S. § 7–61–101, et seq., which is applicable to limited partnerships formed prior to November 1, 1981.

The evidence at trial was clear and unequivocal that the limited partnerships had no debts other than the amounts owing to the limited partners on account of their capital contributions. A plain reading of C.R.S. § 7–62–607 shows that this statute, and particularly the emphasized portion cited *supra,* is intended for the protection of creditors of the limited partnership, not for the protection of the limited partners as such. Since the evidence has shown that there were no such creditors, the Plaintiff has failed in his proof. It is, therefore,

ORDERED that judgment shall enter in favor of the Plaintiff, Harvey Sender, Trustee, and against the Defendant, Estill H. Buchanan, a/k/a Mary Estill Buchanan, under 11 U.S.C. § 547(b) in the sum of $248,896.88, plus costs. It is

FURTHER ORDERED that, in the alternative, judgment shall enter in favor of the Plaintiff Harvey Sender, Trustee, and against the Defendant, Estill H. Buchanan,

a/k/a Mary Estill Buchanan, under 11 U.S.C. § 548(a)(2), plus costs. It is

FURTHER ORDERED that the findings and conclusions herein shall be considered proposed findings and conclusions only as to the Plaintiff's claims under C.R.S. § 7–62–101, et seq., in accordance with 28 U.S.C. § 157(c)(1). Based upon these proposed findings and conclusions this Court recommends that the Plaintiff's Third Claim for Relief be dismissed for lack of evidence.