In re **BOSTON PUBLISHING COMPANY, INC., Debtor.**

Stephen S. **GRAY, in his capacity as Creditors' Representative, Plaintiff,**

v.

Malcolm G. **CHACE, III, Defendant.**

Bankruptcy No. 94–15098–JNF.
Adversary No. 95–1628.

United States Bankruptcy Court,
D. Massachusetts,
Eastern Division.

May 2, 1997.

Andrew Griesinger, and Christine Conley, Choate, Hall & Stewart, Boston, MA, for Stephen S. Gray.

Joseph S.U. Bodoff, and Evan Slavitt, Hinckley, Allen & Snyder, Boston, MA, for Malcolm G. Chace, III.

## MEMORANDUM

JOAN N. FEENEY, Bankruptcy Judge.

## I. PROCEDURAL HISTORY

The matter before the Court is the five-count "Substituted Complaint to Avoid and Recover Preferential Transfers" filed by Stephen S. Gray, the Creditors' Representative ("Gray" or the "Creditors' Representative") of Boston Publishing Co., Inc. ("Boston Publishing" or the "Debtor").[1] The Creditors' Representative filed his Substituted Complaint on November 13, 1995, seeking the recovery of the following payments made by the Debtor pursuant to 11 U.S.C. § 547(b):[2]

| COUNT | DATE | METHOD OF PAYMENT | AMOUNT |
|---|---|---|---|
| Count I | 1/1/94 | Check (#11068 Bank of Boston) | $8,109.56 |
| Count II | 12/29/93 | Check (#11010 Bank of Boston) | $14,689.86 |
| Count III | 3/4/94 | Check (#11717 Bank of Boston) | $9,000 |
| Count IV | 5/31/94 | Check (#12880 Bank of Boston) | $5,648.04 |
| Count V | 12/8/93 | Wire Transfer | $335,500.00 |
| Count V | 12/8/93 | Wire Transfer | $66,645.00 |

1. Pursuant to the order dated July 18, 1995 confirming the Creditors' Plan of Reorganization, the estate's avoidance powers were transferred to the Creditors' Representative.

2. Section 547(b) of the Bankruptcy Code provides the following:

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—
(1) to or for the benefit of a creditor;
(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
(3) made while the debtor was insolvent;
(4) made—
(A) on or within 90 days before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
(5) that enables such creditor to receive more than such creditor would receive if—
(A) the ease were a case under chapter 7 of this title;
(B) the transfer had not been made; and
(C) such creditor received payment of such debt to the extent provided by the provisions of this title.
11 U.S.C. § 547(b).

The Defendant, Malcolm G. Chace, III (the "Defendant" or "Chace") filed an Answer to the Substituted Complaint on December 4, 1995. In his Answer, Chace admitted that the Debtor made the above payments *to him* with respect to antecedent debts within one year of the bankruptcy petition, which the Debtor filed on August 3, 1994. However, Chace indicated that he lacked sufficient information to admit or deny the Debtor's solvency on the dates of the above transfers, and he denied receiving more than he would have received if the Debtor's estate had been liquidated, the payments had not occurred, and he had received payments to the extent permitted by the Bankruptcy Code. Chace also raised defenses under 11 U.S.C. § 547(c)(1), (2) and (4) of the Bankruptcy Code.[3]

On August 28, 1996, the Creditors' Representative filed a Motion for Summary Judgment. Between the filing of the Motion for Summary Judgment and the filing of the Defendant's Memorandum in Opposition to the Motion for Summary Judgment, the parties filed a Joint Pretrial Memorandum. The Court heard oral argument on the Motion for Summary Judgment on September 16, 1996. On October 31, 1996, the Court denied the Creditors' Representative's Motion for Summary Judgment, in part, finding that the parties' pleadings and affidavits raised genuine issues of material fact with respect to the Debtor's solvency and the nature and extent of the "new value" allegedly provided by the Defendant. The Court granted the Motion for Summary Judgment with respect to the Defendant's affirmative defense under § 547(c)(1), thereby leaving the Defendant with a single affirmative defense under § 547(c)(4). The Court previously had struck the Defendant's affirmative defense under 11 U.S.C. § 547(c)(2) in an order dated July 12, 1996 pertaining to a Petition for Contempt and Sanctions filed by the Creditors' Representative.

The Court conducted a trial on February 2, 1997. Seven witnesses testified and 22 exhibits were admitted into evidence. Based upon the testimony and documentary evidence, the Court now makes the following findings of fact and conclusions of law in accordance with Fed. R. Bankr.P. 7052.

## II. FACTS

The Debtor was in the business of selling merchandise through catalogues. It offered gifts, home furnishings and jewelry through catalogues known as Museum Collections, Finishing Touches and Adornments. It sent catalogues to potential customers using mailing lists that it owned as well as lists that it rented from other companies through a broker. The Debtor's mailings ranged in number from 1,200,000 to 3,000,000, with the greatest number of mailings occurring during the Christmas season. The Debtor generated its greatest revenues during its fourth quarter, which coincided with the busy Christmas season when its mailings reached their highest volume.

Chace's involvement with Boston Publishing began when he was contacted about making an investment by his next door neighbor, Douglas Rhodes ("Rhodes"), who with his friend, Robert George ("George"), was forming the company. Initially, Chace made an equity investment in the Debtor, acquiring

---

**3.** Section 547(c) of the Bankruptcy Code provides in relevant part the following:

    (c) The trustee may not avoid under this section a transfer—
        (1) to the extent that such transfer was—
        (A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and
        (B) in fact a substantially contemporaneous exchange;
        (2) to the extent that such transfer was—
        (A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

        (B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and
        (C) made according to ordinary business terms; . . .
        (4) to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor—
        (A) not secured by an otherwise unavoidable security interest; and
        (B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor.

    11 U.S.C. § 547(c)(1), (2) and (4).

approximately $46,000 worth of common stock with funds from his personal account. Chace was appointed to the Board of Directors in February of 1990 at about the same time that he made his initial investment in the company. He served as a director until he resigned from the Board on January 25, 1994.

During 1990 and 1991, Chace made an additional series of investments in Boston Publishing. In total, Chace, the Malcolm G. Chace, III Trust under agreement dated August 30, 1938 (the "1938 Chace Trust") and the Malcolm G. Chace, III Trust under agreement dated December 12, 1950 (the "1950 Chace Trust") (collectively referred to as the "Chace Trusts") invested in or loaned to the Debtor over $2,000,000, and, thus, Chace and the Chace Trusts were creditors of the Debtor prior to the Debtor's restructuring in February of 1994. Chace testified that he is the sole beneficiary of each trust and has decision-making authority with respect to the disposition of trust funds because the trustees approved all his decisions. Nevertheless, Chace admitted that the trusts filed income tax returns and that his children are the remaindermen under the terms of the trusts.

In addition to investing in Boston Publishing and loaning it money, Chace guaranteed a $400,000 unsecured line of credit from Citizens Bank for the benefit of the Debtor on March 18, 1992. For performing this service, the Debtor agreed to pay Chace a 4% annual fee.

Beginning in October of 1993, George, the Debtor's president, approached Chace for additional loans to fund inventory purchases to fill orders placed with Boston Publishing by consumers. Chace agreed to a series of loans which enabled the Debtor to obtain the release of inventory, thereby permitting it to fill purchase orders and concomitantly collect revenue during the Christmas season. Chace made three loans each in the sum of $400,000. Chace made the first two loans from his personal funds, while the last loan was made from funds held by the 1938 Chace Trust. The first loan was represented by a note dated October 8, 1993 payable to Chace at 10% interest. It was due on January 15, 1994. The second note, also payable to Chace, was dated November 8, 1993. It called for a 10% interest rate and was due on January 15, 1994. The third note was a demand note, dated November 23, 1993, payable to the 1938 Chace Trust. Like the other notes, it called for a 10% interest rate. The parties contemplated that the Debtor would repay the loans from monies received from Christmas sales.

On December 8, 1993, the Debtor repaid Chace $401,645. Chace received the note payment through two wire transfers in the amounts of $66,645 and $335,000. In the Joint Pretrial Memorandum, the parties agreed that this payment was made pursuant to the October 8, 1993 note, which was payable to Chace.[4] However, in his post-trial memorandum, Chace stated the following:

> Precisely which loan was intended to be repaid is a matter of some dispute; the calculated amount of interest . . . is consistent only with repayment of the $400,000 loan made by Mr. Chace from trust funds. Mr. Chace confirmed that this amount was erroneously wire transferred by Boston Publishing into his personal account instead of the trust account.

Chace correctly points out the confusion. Pursuant to the terms of all the notes, interest was to be calculated on the basis of a 360 day year. Because each note called for a 10% interest rate, each note would require the payment of interest at the rate of $111.11 per day. The amount of interest paid on December 8, 1993, namely $1,645, represents interest at 10% for approximately, but not precisely, 15 days (i.e., 14.8 days). The Debtor executed the November 23, 1993 note 15 days before the December 8, 1993 payment. Accordingly, absent Chace's concession that "whether or not the payments in question were applied to the trust loan or his

---

4. In the Joint Pretrial Memorandum, the parties defined the October 8, 1993 note as the "Note." In the Admitted Facts, they stated that "[o]n December 8, 1993, Chace was paid $401,645 as payment of all principal on the Note plus $1,645 as payment toward accrued interest. . . ." They also stated that "[n]o principal payments were ever made on the Second Note or the 1938 Trust Note."

personal loans, he is willing to assume personally the liability, if any, if it is determined that the payments are avoidable," this Court would have to determine whether Chace or the 1938 Chace Trust, which is not a defendant in this adversary proceeding, received the alleged preference payment on December 8, 1993.

On December 29, 1993, Chace issued an invoice to the Debtor for interest in the amount of $10,577.23. On the same day, he received a $14,689.86 payment from the Debtor on account of interest due and his guaranty fee. On January 11, 1994, Chace received another interest payment in the sum of $8,109.56.

According to Albert Gordon, the Debtor's Chief Financial Officer, Boston Publishing lost money every year in which it operated. Toward the end of 1993, Boston Publishing desperately needed an infusion of cash and began approaching outside investors to obtain a capital infusion. The directors held a Special Meeting of the Board of Directors on December 10, 1993. At the meeting, which Chace attended, the directors discussed proposed offers from Hanover Direct, Inc. ("Hanover"), which had submitted its initial restructuring proposal two days before the meeting, Fulcrum Capital Partners, Lillian Vernon and The Museum Company, as well as the Debtor's capital structure and operating results. The minutes reflect the Debtor's problems fulfilling back orders and generating cash flow. The minutes also reflect the following: "Kim [Malcolm] Chace emphasized the ongoing problem of the credibility of the numbers being presented to him."

Chace's position as a shareholder and principal of Point Gammon Corporation ("Point Gammon"), which has an office in Providence, Rhode Island, is pertinent to the events that transpired after the December meeting of the Board of Directors. Point Gammon, which is owned by Chace and his cousin, Arnold Chace, is a vehicle for managing Chace family investments. According to Chace, it has no assets or liabilities and is used for preparing payrolls and doing bookkeeping, accounting and tax work for family investments in exchange for fees. Point Gammon employs LJT Associates ("LJT"), whose only employee is Thomas Gardner ("Gardner"). LJT and Gardner only perform consulting services for Point Gammon.

On January 25, 1994, approximately six weeks after the Board of Directors meeting at which the Hanover and other offers were discussed, Chace resigned from the Board of Directors and Gardner, as Chace's designee, replaced Chace as a director. On December 22, 1993, prior to his resignation as a director, Chace executed a Durable Power of Attorney in favor of Gardner with respect to the following property, which was defined as "My Property":

> ... any interest now or hereafter possessed by me alone or with others in and to any shares of the capital stock of Boston Publishing Company ... and in and to any indebtedness of the Company and all indebtedness and capital stock of the Company into which any such capital stock and indebtedness may be converted or for which any such capital stock and indebtedness may be exchanged or any capital stock or indebtedness resulting from any restructuring or recapitalization of the Company and all interest, dividends or other proceeds of any of the foregoing wherever situated or located and whether now owned by me or at any time hereafter acquired by me (including, without being limited to, the property described in any exhibit hereto).

Through the power of attorney, Chace granted Gardner the power to do, among other things, the following:

> 1. To take full care and management of all My Property.
>
> 2. To sell, transfer and convey, exchange and grant options with respect to any or all of My Property from time to time in My Attorney's discretion for such prices and upon such terms and conditions, including sales upon credit, as My Attorney may deem best. . . .
>
> 4. To consent to the reorganization, recapitalization, consolidation, merger, dissolution or liquidation of the Company.

Additionally, through the power of attorney, Chace granted Gardner the following power: "full power and authority to do and perform

any and all acts needed to be done, as fully to all intents and purposes as I might or could do if personally present...." Arnold Chace and others associated with the family investments executed similar powers of attorney in favor of Gardner.

On or around January 13, 1995, Boston Publishing received a commitment letter from Hanover. Chace resigned from the Board of Directors less than two weeks later. On February 25, 1994, Boston Publishing and Hanover consummated their restructuring agreement. According to the Joint Pretrial Memorandum, under the terms of the agreement, "all of the Debtor's outstanding notes, including the Second Note and the 1938 Trust Note, were exchanged for limited partnership interests in a limited partnership ... that, upon inception, became a shareholder of the Debtor.... Notes held by Chace, the 1938 Chace Trust and the 1950 Chace Trust, in the aggregate principal amount of $1,337,-815.37—which sum included the Second Note and the 1938 Trust Note—was converted [sic]."[5] As result of the restructuring agreement, Hanover made available to the Debtor a secured line of credit in the sum of $4,250,-000, of which Hanover actually loaned $2,195,000. According to Chace, Hanover, which is a publicly-traded catalogue company, would not have proceeded with the restructuring without all the outstanding notes and debentures of Boston Publishing, including all obligations owed to him, being converted into equity.

Following the restructuring, Chace received a $9,000 payment from the Debtor. According to the Joint Pretrial Memorandum, this payment represented accrued interest on the Second Note and on the 1938 Trust Note through the closing of the restructuring. On May 31, 1994, within 90 days of the filing of the Debtor's bankruptcy petition, Chace received another payment in the sum of $5,486.04 for legal fees paid to

Hinkley, Allen & Snyder, relating to the restructuring and debt conversion. Chace explained these fees as follows:

> When we went through the recapitalization deal, the three general partners got together and decided that it did not make a lot of sense for all of us to hire a counsel to work on this one deal, and therefore we selected one of our counsels and went to the company and said we're going to have some legal expenses, it's part of the refinancing, we would like you to pay the expenses for all the stockholders, and they did. And seeing that we had no bank account or anything, I suggested that Hinkley/Allen bill me personally and then I would subsequently bill the company.

With respect to the solvency of the Debtor at the times Chace's advances were repaid, the Creditors' Representative submitted substantial evidence of the Debtor's insolvency, including the following: 1) the testimony of Albert Gordon, the Debtor's Chief Financial Officer; 2) the testimony of Gary Cataldo, the Debtor's Controller and interim Chief Financial Officer regarding preparation of the Debtor's bankruptcy schedules; 3) the testimony of the Defendant and his designee to the Board of Directors, Gardner; 4) the audited balance sheets of Boston Publishing for the years ending December 31, 1992 and December 31, 1993; 5) the Debtor's unaudited balance sheets for January, February and May, 1994; 6) the Debtor's Schedules filed on September 2, 1994, which showed total assets of $2,480,875.80 and liabilities of $5,768,692.09; 7) the order entered on February 17, 1995 approving the terms of the proposed sale of the Debtor's assets to Interactive Arts Holding, Inc. ("Interactive") for $2.6 million, plus the assumption of approximately $500,000 in debt, which purchase price included a $200,000 deposit that was forfeited upon Interactive's failure to consummate the sale;[6] 8) the order of May 16,

---

**5.** The notes to the audited financial statements prepared by Arthur Andersen & Co. contain detailed descriptions of the significant terms of the transactions. They reveal that Hanover agreed to purchase 1,104,358 shares of Boston Publishing stock for a total capital contribution of $10.00. In connection with the purchase, Hanover promised to assist the company in obtaining

certain services and agreed to offer the company certain borrowing capability. Hanover acquired an ownership interest of 20%. Hanover also obtained the right to designate two members to Boston Publishing's nine-member Board of Directors.

**6.** The offer provided for the acquisition of the following:

1995 approving the "Stipulation Resolving Claims of Hanover Companies and Granting Hanover Finance Corporation Relief from the Automatic Stay with Respect to Certain of Its Collateral," in which Hanover acquired certain of the Debtor's assets, including inventory, trade names, mailing lists, goodwill and other intangible assets in satisfaction of its secured claim in the amount of $1.4 million and the estate obtained a waiver of Hanover's unsecured claim, which the Creditors' Committee believed to be $550,000 and Hanover believed to be $1.05 million; 9) the value of assets remaining after approval of the Hanover Stipulation: cash ($390,000), Interactive deposit ($200,000), accounts receivable ($90,000), deposits ($100,000) and furniture, fixtures and equipment($20,000); and 10) the actual dollar amounts received from the liquidation of furniture and fixtures ($3,900), the name Boston Publishing ($1,000) and artwork ($5,000).

Albert Gordon testified about the Debtor's mailing list, for which the Debtor received approximately 10 cents per name per month, excluding fees and from which the Debtor generated income of approximately $30,000 per month. Gordon also indicated that the Debtor in addition to losing money every year it which it operated, had defaulted on its obligation to pay interest on its 1990 and 1992 debentures. He explained that the Debtor was unable to pay all its debts as they came due during 1993 and 1994 and that, at the end of January, 1994, the Debtor had only $5,034 in cash to operate. Gordon also described the Debtor's problem with back orders (34% in the case of the Museum Collections catalogue) and the effect the back orders had on expenses, namely the escala-

tion of fulfillment costs and the risk of cancellations.

Chace testified as to the amount of money that he had either invested in or lent to the Debtor either personally or through the 1938 Chace Trust or the 1950 Chace Trust. In sum, according to Chace, prior to the restructuring, the Debtor owed him $491,-596.91, and it owed his trusts $885,000. At the time of the commencement of the bankruptcy case, the Debtor owed Chace nothing as a result of either loan repayments or the roll-over of debt into equity that occurred as a result of the restructuring, except for a contingent claim arising from Chace's Citizens Bank guarantee.

Chace also testified that he realized that the Debtor would not be able to continue in business absent the Hanover restructuring. Accordingly, he admitted that the restructuring was not adverse to his interests because it appeared that it would be more likely that he would be paid after the restructuring, particularly as the repayment of $400,000 was earmarked for him as a priority after the Hanover restructuring.

Gardner testified about the Debtor's precipitous downward economic slide after the Hanover restructuring. He noted that the Debtor failed to meet its economic projections as sales did not meet management's forecasts. Gardner also testified that, although he owed his employment to Chace, was Chace's designee to the Debtor's Board of Directors and was Chace's "attorney" pursuant to the durable power of attorney described above, he did not believe that he was

all of the assets, properties and rights owned by the Seller or in which the Seller has any right or interest of every type and description, real, personal and mixed, tangible and intangible, including, without limitation, software ..., licenses thereto, business agreements, property, equipment, inventory, all cash on hand and in banks ... prepaid expenses and advance payments, tax refunds and tax credits, notes and accounts receivable and all other sums due the Seller, good will, supplier and customer lists, patents, trademarks, trade names, licenses and permits, pending applications for patents, trademarks, trade names and licenses, processes, know-how, show-how, trade secrets, computers and computer equipment, computer programs, all books of ac-

count, files and other records, systems and processes, contracts, arrangements and understandings, oral and written, formal and informal, for work to be performed and/or services to be provided, real estate and interest therein, buildings, leasehold and other improvements, machines, machinery, warehouse equipment, furniture, fixtures, vehicles, supplies, all rights and claims under insurance policies and other contracts of whatever nature, all causes of action, judgments, claims and demands of every nature and all other rights in funds of whatever nature, and all other assets, properties and rights of every kind and nature owned by the Seller, whether or not specifically referred to in this Agreement....

Chace's agent with respect to his duties as one of the Debtor's directors.

The Debtor's audited financial statements, which despite the Debtor's substantial losses lacked a going concern qualification from Arthur Andersen & Co., show that the Debtor was insolvent according to Generally Accepted Accounting Principles ("GAAP"). Although the financial statements utilize the book or depreciated value of assets and do not include customer lists or good will as assets, the amount of the Debtor's liabilities far exceeded the value of its assets for the 1992 and 1993 fiscal years. As of December 31, 1992, its liabilities exceeded its assets by $4,051,788 while at the end of 1993 its liabilities exceeded its assets by $8,385,280. As of January 31, 1994, the Debtor's liabilities exceeded its assets by $862,321, although the balance sheet had been adjusted to reflect the effect of the Hanover recapitalization which took place in February of 1994. The adjustment had the effect of eliminating $6.9 million in long-term debt reported on the 1993 year-end audited statements. As of February 28, 1994, just after the Hanover restructuring, the Debtor's liabilities exceeded its assets by $1,044,924, and as of May 31, 1994, its liabilities exceeded its assets by $1,661,007.

Additionally, the Debtor's financial statements show that the Debtor lost $3,037,702 on sales of approximately $11 million in 1992 and that the Debtor lost $4,333,492 on sales of approximately $12 million in 1993. After four years of operation, the Debtor had an accumulated deficit of approximately $10.8 million.

The Creditors' Representative testified about the Liquidation Analysis he prepared as of July 28, 1994. Applying a percentage recovery to the book value of the Debtor's assets as of July 28, 1994, the Creditors' Representative calculated that he could recover $1,803,000 from which he would have to subtract 1) liquidation costs of approximately 10% for trustee commissions, professional fees and other costs of winding down the operations of the Debtor, including marketing and auction expenses; and 2) Hanover's secured debt. According to Gray, $477,700 would then be available to satisfy current liabilities of $4,259,000, Hanover's unsecured debt of $1,050,000 and Chace's debt of $439,000. Using these figures, Gray computed a dividend of 8.3% in a hypothetical liquidation. Moreover, pursuant to the Joint Pretrial Memorandum, the parties agreed that the unsecured creditors have received an interim dividend of 7%. As part of the Creditors' Plan of Reorganization, the Debtor's equity shareholders will receive nothing.

In addition to testifying about a hypothetical liquidation of the company, Gray also testified about the Debtor's revenue losses based upon a review of the Debtor's books and records. He stated that the company was "a losing proposition from the beginning." He added that "[t]he name of a business can only be valued based on its—on the earnings that it achieves, and this company never earned any—had any really [sic] earnings at all."

With respect to his new value defense, Chace relied upon the testimony of Stephen V. Darr, a certified public accountant and partner in the accounting firm of KPMG Peat Marwick. Darr expressed the opinion that Chace provided new value to the Debtor when Chace's debt was converted to equity at the time of the Hanover restructuring. Pursuant to the Hanover refinancing agreement and closing documents, which were accepted into evidence, each note holder had to agree to become a shareholder. By virtue of the subordination of debt to equity, the Debtor was able to attract a line of credit. According to Darr, "[i]f everyone didn't get into the boat, it wouldn't have left the pier."

In computing the amount of new value contributed by Chace to the Debtor, Darr first determined the percentage of claims attributable to Chace by dividing the total amount of Chace's claims, $1,376,597, by the total amount of claims, $6,962,735.[7] In calcu-

---

7. Darr considered the following claims:

| Debt | Chace's Claims | Total Claims |
|---|---|---|
| Class A–Senior Notes | $800,000 | $800,000 |
| Class B–Senior Demand Notes | $150,000 | $3,862,735 |

lating that Chace held 19.77% of the total claims, Darr did not include Chace's stock. Darr thus determined that Chace's contribution was responsible for 19.77% of the new credit of $4,250,000 extended by Hanover or approximately $840,000. However, because the Debtor borrowed only $2,195,000 and did not use the entire credit line available to it, Darr concluded that Chace's subordination resulted in the Debtor receiving $433,952 or 19.77% of $2,195,000.

On cross examination, Darr conceded that if Chace's personal loans were treated separately then the "new value percentage" dropped to 6.65%. Moreover, he also conceded that Hanover's loan was only partially secured so that Chace could be said to have contributed only $69,825 in new value (i.e., 6.65% of $1,050,000).[8]

## III. POSITIONS OF THE PARTIES

### A. The Preference Counts

#### 1. The Creditors' Representative

In his Memorandum, the Creditor's Representative identifies the following four issues: 1) whether Chace was an insider of the Debtor when each of the transfers was made; 2) whether the Debtor was insolvent; 3) whether Chace received more as a result of the transfers than he would have received had the transfers not been made and the Debtor's assets were liquidated and distributed in a Chapter 7 case; and 4) whether and to what extent Chace provided "new value" to the Debtor after the transfers were made. Chace does not dispute that these are the relevant issues.

With respect to the first issue, the Court notes that there is no dispute that Chace was

an insider as that term is defined under the Bankruptcy Code, *see* 11 U.S.C. § 101(31)(B)(i), until he resigned from the Board of Directors on January 25, 1994. Accordingly, only the transfer to Chace that occurred after that date but before the 90–day preference period commenced can be challenged as having been made outside the 90–day preference period to a non-insider. Thus, the payment made on March 4, 1994 in the amount of $9,000, but not the May 31, 1994 payment in the amount of $5,486, which was made within the 90 days before the August 3, 1994 bankruptcy filing date, is at issue. Gray maintains that although Chace resigned as a director, his status as an insider continued because his designee to the Board of Directors, Gardner, was unquestionably his agent.

With respect to the issue of the Debtor's solvency, the Creditors' Representative argues that the overwhelming weight of the evidence compels the conclusion that the Debtor was insolvent at the time of the transfers in question. Although recognizing that evidence of the fair value of the Debtor's assets is preferable, Gray contends that the actual sale prices received for the Debtor's assets did not come close to closing the gap between the book value of the assets and the amount of the Debtor's liabilities, particularly when the pre-paid catalogue costs are deleted from the asset side of the financial statement because these prepaid expenses for unissued catalogues are booked as expenses when the catalogues are issued. Gray emphasizes that although Chace attempted to show that goodwill and customer lists had substantial value the testimony was insufficient to establish a precise value.

**8.** This calculation is predicated upon total Chace debt of $491,596.91 plus $26,000 in accrued interest on the Senior Demand Note and on the 1990 Debentures, which was waived, divided by the long term debt of $6,962,735 plus $821,135 in interest, which also was waived. The amount of interest that was waived is listed as a current liability on the Debtor's 1993 balance sheet.

| | | |
|---|---|---|
| Class C–1992 Subordinated Debentures | N/A | $1,200,000 |
| Class D–1990 Redeemable Subordinated Debentures | $426,597 | $1,100,000 |
| Class E–Old Common Stock at $2.12 per share | N/A | N/A |
| TOTAL | $1,376,597 | $6,962,735 |

The Creditor's Representative also argues that Chace received more than he would have received if the transfers had not been made and the case were a case under Chapter 7. Based upon the estimated dividend of 8.3% set forth in the Liquidation Analysis he prepared (Plaintiff's Exhibit 20), the Creditors' Representative maintains that he satisfied the requirement of § 547(b)(5) that, unless the estate is sufficient to provide a 100% distribution to unsecured creditors, an unsecured creditor who receives a payment during the preference period receives more than that creditor would receive in a Chapter 7 liquidation.

### 2. The Defendant

Chace concedes that the transfers in question were made within one year of the filing of the Chapter 11 petition on account of antecedent debts. However, he maintains that the Creditors' Representative failed to prove that he was an insider at the time of the $9,000 transfer, that the Debtor was insolvent at the time of the transfers and that the transfers enabled him to receive more than he would have received in a Chapter 7 case if the transfers had not been made.

Chase maintains that he was not an insider of the Debtor after January 25, 1994 and that Gardner was not his agent, thereby insulating the March 4, 1994 payment from attack as a preference. He argues that Gray failed to introduce any evidence that Chace was in actual control of Boston Publishing either directly or indirectly after that date. Chace, citing *In re Murchison*, 154 B.R. 909, 913 (Bankr.N.D.Tex.1993), argues that to be a "person in control," the creditor must possess sufficient control to dictate corporate policy and the disposition of corporate assets. He also argues that in the absence of proof that he exerted management control, the Court must find that he was not an insider for purposes of the March 4, 1994 transfer.

Noting that the presumption of insolvency dissolves outside the 90–day period preceding the filing of a bankruptcy petition, Chace asserts that the Creditors' Representative was required to prove by a preponderance of competent evidence that the sum of the Debtor's debts was greater than all of its property at a *fair valuation*. 11 U.S.C. § 101(32) (emphasis supplied). According to Chace, the Creditors' Representative was required to value the Debtor's assets "not as isolated articles, but as a going concern." Thus, Chace, citing *Orix Credit Alliance, Inc. v. Harvey (In the Matter of Lamar Haddox Contractor, Inc.)*, 40 F.3d 118 (5th Cir.1994), contends that Gray's reliance on the Debtor's balance sheet figures was inadequate to satisfy his burden of proof.

Chace, relying upon his testimony and that of Gordon, also criticizes the Creditors' Representative for failing to submit expert testimony as to the value of the Debtor's assets. He notes that Gray failed to value the Debtor's customer list, which was rented by the Debtor at about 10 cents per name, generating income of approximately $30,000 per month for the first nine months of 1993, as well as the Debtor's other intangible assets, including its trade names, trademarks, organizational value, backlog of orders and goodwill. Chace also relies upon the absence of a going concern qualification to support his contention that Gray failed to prove insolvency. Additionally, Chace argues that the Debtor's liabilities should have been recharacterized, particularly Hanover's debt, because the Creditors' Committee sought to recharacterize some of the debt as equity during the course of the Chapter 11 case.

Chace also contends that the Creditors' Representative failed to introduce competent evidence with respect to the requirements of § 547(b)(5). He maintains that Gray was required to prove that Chace would have received less than 24.7% (the total amount he received on all his claims) in a Chapter 7 case.[9]

9. The Court is unable to discern how Chace arrived at this percentage. According to Chace he held the following claims against the Debtor as of February 25, 1994:

| | |
|---|---|
| Class A—Senior Notes | $800,000 |
| Class B—Senior Demand Notes | 150,000 |
| Class C—1992 Subordinated Debentures | — |
| Class D—1990 Subordinated Debentures | 426,597 |
| Subtotal of Debt Issues | 1,376,597 |

## B. The Subsequent New Value Defense

### 1. The Defendant

Chace, principally relying upon *Reigle v. Mahajan (In re Kumar Bavishi & Associates)*, 906 F.2d 942 (3d Cir.1990), describes how he provided new value to Boston Publishing as follows:

> Mr. Chace provided new value to Boston Publishing when he and the trusts in which he was the sole beneficiary converted their $1,337.815.37 [sic] of debt into limited partnership interests in a limited partnership which became a shareholder of the company. There is no doubt that this so-called conversion of debt to equity was the equivalent of a complete write-off of the debt.... As a result of the conversion, Boston Publishing was able to obtain loans of fresh money from Hanover Direct in an amount in excess of $2 million....

\*　　\*　　\*　　\*　　\*　　\*

Not only can the so-called conversion of debt to equity constitute new value, but in this case it provided a real and quantifiable benefit to Boston Publishing. The fact that after the so-called conversion of debt to equity the company was solvent, in itself, is evidence that the value of the conversion was at least equal to the amount of the alleged preferential payments, since the harm which the preference statute addresses, i.e., payment on account of antecedent debts while the debtor was insolvent, was remedied when the conversion occurred. In addition, an analysis of the value of the conversion was performed by the accounting firm of KPMG Peat Marwick, LLP. As the testimony of Stephen B. Darr indicates, the conversion, which (1) reduced the indebtedness on Boston Publishing's balance sheet by $1,337,815.37 [sic] and (2) permitted Boston Publishing to obtain over $2 million of new loans from Hanover Direct, provided new value to Boston Publishing in an amount equal to at least $431,161 [sic].

Class E—Old Common Stock
@ Stated Value of $2.12　　321,344

Total　　$1,697,941

The closest percentage figure the Court can derive is from adding the first three alleged prefer-

As evidence of the Debtor's solvency after the restructuring, Chace relies upon the Debtor's representation made in the restructuring documents that the company was solvent. Chace also argues that in considering new value the Court should consider the conversion of debt to equity made by the trusts that he controlled.

### 2. The Creditors' Representative

Gray prefaces his arguments with the observations that Chace has the burden of proving the subsequent new value defense and that to do so he must establish that he gave something of tangible value to the Debtor's estate that can be quantified. Citing *In re Hedged–Investments Associates, Inc.*, 163 B.R. 841, 852 (Bankr.D.Colo.1994), *aff'd,* 84 F.3d 1286 (10th Cir.1996), and *In re Bellanca Aircraft Corporation,* 56 B.R. 339, 393 (Bankr.D.Minn.1985), *aff'd in part, remanded in part,* 850 F.2d 1275 (8th Cir.1988), the Creditors' Representative emphasizes that new value for purposes of § 547(c)(4) cannot be provided by another creditor. Gray argues that Chace provided nothing of tangible value to the Debtor's estate that could be distributed to creditors and that to the extent new value was provided it was provided by Hanover. He also argues that a creditor does not create new value by forgiving some of the debt owed to it in exchange for receipt of a preferential payment because this adds nothing of tangible value that can be distributed to other creditors. According to the Creditors' Representative,

> the action taken by Chace is analogous to the act of subordinating one's debt to the debt of another creditor who makes a new advance. Although such action may have *facilitated* the contribution of "new value" to the Debtor, it did not *constitute* the contribution of the "new value." Subordination certainly is something less than forgiveness, and may be something less than

ence payments ($401,645, $14,689, and $8,109) and dividing them by the total of Chace's debt *and* equity in Boston Publishing, namely $1,697,941, which produces a percentage figure of 24.9%.

forbearance, depending upon the circumstances. If forgiveness and forbearance do not constitute "new value," subordination cannot constitute "new value."

## IV. DISCUSSION

### A. § 547(b)

#### 1. Statutory Purposes

■■■ The purpose of § 547(b) is two fold: 1) to create a disincentive for creditors to pressure financially troubled debtors; and 2) to promote ratable distributions among unsecured creditors by forcing the recipients of preferential pre-petition transfers to equally share the debtor's unencumbered assets. *Gulf Oil Corp. v. Fuel Oil Supply & Terminaling, Inc. (In re Fuel Oil Supply & Terminaling, Inc.)*, 837 F.2d 224, 226 (5th Cir. 1988). Likewise, § 547(c)(4) has two interrelated purposes: "First, the section is designed 'to encourage trade creditors to continue dealing with troubled businesses....' Second, section 547(c)(4) is designed to 'treat fairly a creditor who has replenished the estate after having received a preference.'" *In re Kumar Bavishi & Associates*, 906 F.2d at 951 n. 10 (dissenting opinion) (citations omitted). In analyzing the facts and the arguments of the parties, these purposes provide a framework in which to evaluate the disparate views of the parties. *See Creditors' Committee v. Spada (In re Spada)*, 903 F.2d 971, 976 (3d Cir.1990).

#### 2. Burden of Proof

■■■ Pursuant to § 547(g), the Creditors' Representative bears the burden of proving each of the five elements of § 547(b), three of which are at issue in the instant case: 1) Chace's insider status after he resigned from the Board of Directors on January 25, 1994; 2) the Debtor's solvency in December of 1993 and in January and March of 1994; and 3) whether Chace received more as a result of the preference than he would have received in a Chapter 7 and the payments had not been made. 11 U.S.C. § 547(g). *Ralar Distributors, Inc. v. Rubbermaid, Inc. (In re Ralar Distributors, Inc.)*, 4 F.3d 62, 67 (1st Cir.1993). The preference defendant has the burden of proving any exceptions to § 547(b). 11 U.S.C. § 547(g).

#### 3. Insider Status

■■■ Section 101(31)(B) of the Bankruptcy Code provides that, in the case of corporate debtors, the term "insider" includes directors, officers, persons in control of the debtor, partnerships in which the debtor is a general partner, and relatives of general partners, directors, officers or persons in control of the debtor. 11 U.S.C. § 101(31)(B). The list of persons or entities that may be insiders, which is set forth in § 101(31)(B), is not exclusive. "[A]n insider may be any person or entity whose relationship with the debtor is sufficiently close so as to subject the relationship to careful scrutiny." *Hunter v. Babcock (In re Babcock Dairy Co. of Ohio, Inc.)*, 70 B.R. 657, 660 (Bankr.N.D.Ohio 1986).

■■■ In this case, the Court must determine whether Chace continued to be an insider of the Debtor after his resignation from the Board of Directors. The precise issue is whether Chace, despite his resignation from the Board of Directors, remained a *de facto* director or was a person in control of the Debtor because 1) Gardner was his designee to the Board; and 2) Gardner was his agent as a result of the agency relationship created by the durable power of attorney that Chace executed in favor of Gardner. *Gagnon v. Coombs*, 39 Mass.App.Ct. 144, 154, 654 N.E.2d 54 (1995) (a power of attorney creates a traditional principal-agent relationship); *Myers v. Cloutier (In re Cloutier)*, 21 B.R. 64, 65 (Bankr.D.Mass.1982) (power of attorney created a principal-agent relationship).

Insider status must be determined on a case by case basis based on the totality of the circumstances and the creditor's degree of involvement in the debtor's affairs. *CPY Company v. Ameriscribe Corp. (In re Chas. P. Young Company)*, 145 B.R. 131, 136 (Bankr.S.D.N.Y.1992). For a person to be considered an insider it must appear that they have "at least a controlling interest in the debtor or ... exercise sufficient authority over the debtor so as to unqualifiably dictate corporate policy and the disposition of corporate assets." *Babcock*, 70 B.R. at 661

(citations omitted). It is not enough that the alleged insider have only a superior bargaining position or a contractual relationship with the debtor. *Id.* In *Chas. P. Young Company,* the court cited *In re F & S Cent. Mfg. Corp.,* 53 B.R. 842, 848 (Bankr.E.D.N.Y. 1985), for the proposition that "a creditor is in control of a debtor when the creditor has a special relationship with the debtor which can not be characterized as at arms length." 145 B.R. at 136. *See also Murchison,* 154 B.R. at 911.

In the present case, Chace, pursuant to the power of attorney, granted Gardner expansive authority with respect to his interest in Boston Publishing. Indeed, Chace authorized Gardner "[t]o consent to the reorganization, recapitalization, consolidation, merger, dissolution or liquidation of the Company." Accordingly, Gardner had full control over Chace's affairs insofar as his debt and equity positions in the Debtor were concerned. However, the principal/agent relationship created by the power of attorney did not extend to Gardner's separate role and duties as a member of the Board of Directors of the Debtor. Gardner's position as Chace's "designee" did not require him to perform his directorship duties as Chace's agent, and, thus, he was not required to make decisions as a director subject to the fiduciary relationship that existed as a result of the agency relationship created by the power of attorney.

In view of Gardner's unrebutted testimony, the Court is unable to conclude that Gray submitted sufficient evidence for this Court to find that Chace was in effect a *de facto* director. Moreover, evidence is lacking that either Chace or Gardner exercised managerial control over Boston Publishing or that Chace held sufficient shares in the Debtor to unilaterally dictate corporate policy. Accordingly, the Court finds that the Creditors' Representative has failed to sustain his burden of proof with respect to the alleged $9,000 preference payment, which was made between the time Chace resigned from the Board of Directors and the commencement of the 90–day period preceding the bankruptcy filing.

### 4. Insolvency

Chace relies upon a decision of the United States Court of Appeals for the Fifth Circuit, *In re Lamar Haddox Contractor, Inc.,* 40 F.3d 118 (5th Cir.1994), for the proposition that the Creditors' Representative submitted insufficient evidence to establish that the Debtor was insolvent at the time of the alleged preferential transfers. Applying the clearly erroneous standard of review, the court in *Lamar Haddox* reversed the bankruptcy court's determination that the debtor was insolvent at the time of the alleged preferential transfers. The plaintiff had sought to establish the debtor's insolvency "solely through the testimony of Milton Kelley, a certified public accountant who had prepared the Debtor's tax returns and financial statements . . . ." 40 F.3d at 120. The court summarized the testimony as follows:

> Mr. Kelley's testimony established only that as of September 30, 1988, the date on which the Debtor's fiscal year ended, the company's preliminary unaudited financial statements and its general ledger showed an excess of liabilities over assets (a deficit equity position) of $216,000. He testified that the company had suffered a loss of over $2,000,000 during its preceding fiscal year and that such a loss had reduced the company's positive equity position of $1,787,000 on September 30, 1988. Based on the large operating loss and the resulting balance sheet deficit equity position, he concluded that the Debtor was "probably bankrupt" on September 30, 1988.

*Id.* at 121. In reaching its decision to reverse the bankruptcy court, the court of appeals observed that the plaintiff neither submitted testimony nor financial statements with respect to the fair value of the debtor's property, which consisted primarily of substantially depreciated heavy equipment, the value of which could have exceeded the book value by $216,000. The court stated that in the absence of financial statements that would have enabled it to determine the rate and amount of depreciation, it "was left with only conclusory opinion testimony as to insolvency, without any evidence necessary to support the conclusions." *Id.*

■ This case is distinguishable from *Lamar Haddox* because the Creditors' Representative submitted overwhelming evidence of the Debtor's insolvency. In the first place, the Debtor's year end *audited* financial statements for 1992 and 1993 were submitted into evidence, both of which show deficit equity positions. The Debtor's 1993 balance sheet shows that the Debtor's most valuable assets were its inventory ($697,361), deferred catalog costs, net of amortization ($523,096), and office equipment ($378,990), less accumulated depreciation of $102,140. The notes to the financial statements reveal 1) that the Debtor's inventory was valued at the lower of first-in, first-out cost or market with a reserve for excess and obsolete inventory; 2) that the deferred catalog costs, which having been prepaid would eventually have to be expensed when the catalogues were received and mailed by the Debtor, were of marginal value absent the sale of the Debtor as a going concern; and 3) that property and equipment were recorded at cost. Based upon the total value of the assets appearing on the balance sheets, particularly the 1993 audited balance sheet showing total liabilities of $10,587,188 and a $8,385,280 deficit position, as well as the other evidence discussed below, the Court finds that the burden shifted to the Defendant to prove that balance sheet assets and intangible assets not appearing on the balance sheet were worth in excess of $8,385,280.

The other evidence of the Debtor's insolvency was equally compelling. The Debtor never made a profit in its four years of operation. As Judge Queenan noted in *Vadnais Lumber Supply, Inc. v. Byrne (In re Vadnais Lumber Supply, Inc.)*, 100 B.R. 127 (Bankr.D.Mass.1989),

> [t]he proper standard of valuation to be applied in determining solvency in a bankruptcy proceeding is the value of the business as a going concern, not the liquidation value of its assets less its liabilities.... Liquidation value is appropriate, however, if at the time in question the business is so close to shutting its doors that a going concern standard is unrealistic.... The traditional method of determining going concern value is by capitalizing net profit.

*Id.* at 131. In the instant case, capitalizing Boston Publishing's profits would have been a futile exercise. Indeed, as Chace testified, without the Hanover restructuring, the company was not going to survive, particularly since its cash flow at the end of January 1994 was approximately $5,000, a grossly inadequate sum to sustain the business as a going concern. Thus, use of the liquidation value of the assets would be appropriate in this case.

In *Vadnais*, Judge Queenan also commented that "an unaccepted offer for an entire business can be evidence bearing on the Debtor's value," *id.* at 132, and that an accepted offer may be "the most probative evidence concerning solvency or insolvency." *Id.* In this case, the Creditors' Representative submitted evidence with respect to the Interactive offer which was accepted. Interactive proposed to acquire GAAP assets as well as off-balance sheet assets, including goodwill and customer lists for $2,600,000, plus the assumption of post-petition accounts payable, customer liabilities and certain other obligations under existing contracts, which the Creditors' Representative valued at approximately $500,000. Using this figure of $3,100,000 for the fair value of the Debtor's assets, the Debtor was insolvent at least as of the date of the offer.

When the assets remaining after the Court approved the Stipulation with Hanover were eventually sold, the amounts received for them do not support an inference that the name and goodwill of the Debtor had substantial value. There certainly could be no inference that the values were sufficient to close the enormous gap between the book value of the assets and the Debtor's substantial liabilities.

The Debtor's schedules of assets and liabilities prepared by Cataldo also indicate that the Debtor was insolvent at the time of the Chapter 11 filing. Using the method of retrojection, which the United States Court of Appeals for the First Circuit approved in *Hassan v. Middlesex County National Bank*, 333 F.2d 838 (1st Cir.), *cert. denied*, 379 U.S. 932, 85 S.Ct. 332, 13 L.Ed.2d 344 (1964), and in *Briden v. Foley*, 776 F.2d 379 (1st Cir. 1985), this Court infers that the Debtor was

insolvent at the time of the transfers at issue, an inference that is also supported by Gardner's testimony about the Debtor's economic downward slide after the restructuring.

In summary, the Creditors' Representative established by a preponderance of the evidence that the Debtor was insolvent. The testimony of the Debtor's former Chief Financial Officer and Chace's own qualms about the reliability of the Debtor's numbers and its ability to continue as a going concern absent the Hanover restructuring further support this conclusion.

This case is more analogous to *Lawson v. Ford Motor ·Co. (In re Roblin Industries, Inc.),* 78 F.3d 30 (2d Cir.1996), than the·case relied upon by Chace, *Lamar Haddox.* In *Roblin Industries,* the court considered a preference defendant's contention that the bankruptcy judge erred in finding that the trustee had established that the debtor, Roblin Industries, Inc., was insolvent. The preference defendant, Ford, claimed 1) that it had successfully rebutted the presumption of insolvency by introducing the debtor's schedules and subsequent amendments to the schedules, as well as appraisals used to support post-petition financing, all of which showed the debtor was solvent; and 2) that the use of balance sheet values from an SEC Registration Statement was insufficient to establish insolvency. The court observed that the SEC Registration Statement submitted by the trustee included financial statements and a descriptive text describing the debtor's operations, financial performance and industry conditions, which supported the trustee's contention that the debtor was insolvent. The bankruptcy court, based upon the evidence submitted by the trustee, found that the debtor was a " 'failing business in a failing industry.' " *Id.* at 34. The bankruptcy court also determined that the asset values set forth in the debtor's schedules were incredible.

The United States Court of Appeals for the Second Circuit began its analysis by observing that Ford was correct with respect to the trustee's reliance upon the book value of the debtor's assets, which it described as the historical cost of the assets less accumulated depreciation. It stated the following:

> It is ... true that book values are not ordinarily an accurate reflection of the market value of an asset. "[T]he market value of particular property may of course differ substantially from its book value, and the market value of certain ... assets may [be] greater or less than their book value." Nevertheless, while book values alone may be inappropriate, as a direct measure of the fair value of property, such figures are, in some circumstances, competent evidence from which inferences about a debtor's insolvency may be drawn.

*Id.* at 36 (citations omitted). The court added that Ford incorrectly argued that the trustee relied solely upon evidence derived from the financial statements contained in the Registration Statement. It noted that the trustee submitted evidence as to the debtors' losses, the debtor's inability to pay principal and interest on its bank debt, market conditions and the age of the appraisal used in the preparation of the debtor's schedules. The court concluded that "[w]henever possible, a determination of insolvency should be based on seasonable appraisals or expert testimony. Yet, appraisals are neither the exclusive nor dispositive means to make the determination." *Id.* at 38.[10]

In view of the case law and the multifaceted evidence submitted by the Creditors' Representative, the Court concludes that the burden of proof on the issue of solvency shifted to Chace and that Chace failed to satisfy the burden of establishing the Debtor's solvency. In short, Chace had the bur-

---

**10.** The court quoted the following language from *Porter v. Yukon Nat'l. Bank,* 866 F.2d 355, 357 (10th Cir.1989): "[T]he matrix within which questions of solvency and valuation exist in bankruptcy demands that there be no rigid approach taken to the subject. Because the value of property varies with time and circumstances, the finder of fact must be free to arrive at the 'fair valuation' defined in § 101[(32)] by the most appropriate means." *See also Briden v. Foley,* 776 F.2d at 382 (The "balance sheet test focuses on the fair market value of the debtor's assets and liabilities within a reasonable time of the transfers. Asset valuation need not be exact. Assets should be reduced by the value of the assets not readily susceptible to liquidation and the payment of debts.").

den of rebutting the Creditors' Representative's evidence of insolvency by establishing that the name and good will of the Debtor had significant value or that the historical values appearing on the Debtor's audited and unaudited balance sheets were so low or unreliable that the Debtor's assets would have exceeded its liabilities if the assets had been properly valued. The Court agrees with Chace to the extent that the appraised value of the assets, including the Debtor's intangible assets, would have been a preferable method for the Creditors' Representative to use to establish insolvency. However, in view of his admissions that the company probably could not have remained in business absent the infusion of capital and credit from Hanover at the beginning of 1994 and Chace's misgivings expressed at the December 10, 1993 Board of Directors meeting about the accuracy and reliability of the Debtor's numbers, the Court is persuaded that the preponderance of the evidence established that the Debtor was insolvent at the time of the transfers in question.

### 5. Section 547(b)(5)

The test that the Creditors' Representative must satisfy under § 547(b)(5) is succinctly stated in *Committee of Creditors Holding Unsecured Claims v. Koch Oil Co (In re Powerine Oil Company)*, 59 F.3d 969 (9th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 973, 133 L.Ed.2d 893 (1996). In that case, the court observed that whether the requirement is met turns on the status of the creditor to whom the transfer was made. It stated that "[w]ith respect to unsecured creditors, ... the rule is ... '[a]s long as the distribution in bankruptcy is less than one-hundred percent, any payment "on account" to an unsecured creditor during the preference period will enable that creditor to receive more than he would have received in liquidation had the payment not been made.'" *Id.* at 971 (quoting *In re Lewis W. Shurtleff, Inc.,* 778 F.2d 1416, 1421 (9th Cir. 1985)).

Chace indicates that he received repayment of approximately 25% of his entire debt and that the Creditors' Representative "must prove that he would have received less than 24.7 percent (the total amount he received on all his claims) in a Chapter 7 case." Gray submitted evidence that unsecured creditors would have received 8.3% in a Chapter 7 liquidation. Chace, however, argues that there was a lack of competent evidence as to the liquidation value of assets such as the mailing list and the validity of certain claims such as Hanover's that would undermine that figure.

Chace, however, did not object to the approval of the Stipulation between the Official Committee of Unsecured Creditors and Hanover so that his arguments that Hanover's claims should be reduced for purposes of the Liquidation Analysis lacks merit. The Court also finds that Chace's remaining arguments are flawed. In the first place, Chace cites no legal authority for the proposition that all his loans to the Debtor, which loans were made over several years and total approximately $1.376 million, should be treated as antecedent debt for purposes of the alleged preference payments at issue, even after the obligations were converted to equity. The first three payments made by the Debtor to Chace in the amounts of $401,645, $14,689 and $8,109, respectively, all pertain to either principal and interest due on the $400,000 notes, or to the guarantee fee that the Debtor owed Chace for the Citizens Bank loan in the amount of $8,000. Neither Chace, who issued invoices to the Debtor for interest and his guarantee fee, nor the Debtor considered the payments to be applicable to anything other than specific obligations owed to Chace pursuant to either the three $400,000 notes or the guaranty fees. Accordingly, Chace's suggested distribution of 24.7% is incorrect and inapplicable to the straightforward test under § 547(b)(5).

The Court finds that the Creditors' Representative has satisfied the test under § 547(b)(5). Although Chace identifies problems with the Creditors' Representative's Liquidation Analysis, these do not change the fact that Chace received more with respect to his claims than he would have received in a Chapter 7 case and the payments had not been made.

### B. The New Value Defense

Section 547(c)(4) provides in relevant part the following:

(c) The trustee may not avoid under this section a transfer—...

(4) to or for the benefit of a creditor, to the extent that, after such transfer, *such creditor gave new value* to or for the benefit of the debtor—

(A) not secured by an otherwise avoidable security interest; and

(B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor.

11 U.S.C. § 547(c)(4)(emphasis supplied). A comparison of § 547(c)(1) and § 547(c)(4) is instructive. Section 547(c)(1) provides the following:

(c) The trustee may not avoid under this section a transfer—

(1) to the extent that such transfer was—

(A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for *new value given to the debtor;* and

(B) in fact a substantially contemporaneous exchange....

11 U.S.C. § 547(c)(1). Thus, § 547(c)(4) differs from § 547(c)(1) in that under § 547(c)(4), the creditor must provide new value to the debtor, whereas under § 547(c)(1) the debtor simply must receive new value. New value is defined as

money or money's worth in goods, services, or new credit, or release by a transferee of property previously transferred to such transferee in a transaction that is neither void nor voidable by the debtor or the trustee under any applicable law, including proceeds of such property, but does not include an obligation substituted for an existing obligation.

11 U.S.C. § 547(a)(2).

Cases are legion concerning the viability of new value defenses. *See generally* Robert H. Bowmar, *The New Value Exception to the Trustee's Preference Avoidance Power: Getting the Computations Straight,* 69 Am. Bankr.L.J. 65 (1995); Thomas J. Palazzolo, *New Value and Preference Avoidance in Bankruptcy,* 69 Wash. U.L.Q. 875 (1991). A review of all of them would be unproductive,

particularly as a number of decisions from the Third Circuit directly bear on the issue involved in this case. The case of *In re Spada,* 903 F.2d 971 (3d Cir.1990), is particularly instructive with respect to new value in the context of this case. In *Spada,* the court found that the bankruptcy court correctly determined that a bank's reduction in the interest rate charged the debtor and its agreement to forgo all payments except interest payments for one year constituted valuable consideration that constituted new value to the debtor under § 547(c)(1). *Id.* at 975. However, the court also determined that the bankruptcy court erred in failing to establish the precise value of the new consideration and to compare it to the value of the security interest conveyed. *Id.* Noting that the definition of new value was "'to codify the usual rules of consideration ...'" and that policy considerations pertaining to § 547 are particularly pertinent in the context of loan refinancings, the court stated the following:

Although the substitution of one obligation for an existing obligation does not constitute new value, there is support for the proposition that a modification of the terms of an existing obligation may constitute consideration (i.e., new value). "To the extent that a creditor can demonstrate that its agreement to modify the terms of the debtor's obligation gave the debtor new money or money's worth in new credit, goods, services or property, there is no reason to void the transfer."

*Id.* at 976 (citations omitted). Accordingly, the court found that the difference between three pre-existing loans and a new consolidated loan was so substantial that the new loan with its six point reduction in the interest rate and deferred payment provisions constituted new value. However, the court also found that the plain meaning of § 547(c)(1) and (a)(2) mandated a determination of how much new value was involved in the exchange. *Id.* at 975. It stated that "it was legal error for the bankruptcy court to interpret section 547(c)(1) to allow some new value to enable a creditor to protect a transfer *without a calculation of the amount of*

*that new value."* *Id.* at 973 (emphasis supplied).

In *In re Kumar Bavishi & Associates,* 906 F.2d 942 (3d Cir.1990), the United States Court of Appeals for the Third Circuit revisited issues involving new value under § 547(c)(1). As Chace recognized in his brief, the facts in *Kumar Bavishi* are somewhat similar to the facts in the instant case. In *Kumar Bavishi,* two limited partners of the debtor partnership, who were also creditors of the debtor, together with other limited partners guaranteed payment of a loan from a lending institution that refused to grant the debtor a loan solely on the debtor's credit and that of its general partner. The general partner, on behalf of the partnership, agreed to pay off a portion of the partnership's pre-existing debt to the brothers in an amount equal to their estimated exposure on their personal guarantees. The other limited partners received nothing for their guarantees. Subsequently, the debtor filed a voluntary petition under Chapter 11 and the guarantors were sued by the lending institution and forced to satisfy the loan. The bankruptcy court determined that the brothers had given new value in a contemporaneous exchange for the challenged transfer. The Court of Appeals for the Third Circuit affirmed.

The court framed the issue as follows:

whether executing a personal guarantee to a lending institution, to enable the debtor to obtain additional credit which it would not otherwise have been accorded, qualifies as providing "money or money's worth in goods, services or new credit" within the meaning of section 547(a)(2), such that a contemporaneous exchange for new value took place as required by section 547(c)(1).

*Id.* at 945. Citing *In re Sider Ventures & Services Corp.,* 33 B.R. 708 (Bankr.S.D.N.Y.

1983), *aff'd,* 47 B.R. 406 (S.D.N.Y.1985), the court first determined that the personal guarantees were "an essential prerequisite" to the lender's willingness to make a loan to the debtor and thus should be regarded as services or credit for purposes of § 547(a)'s definition of new value. 906 F.2d at 945. In so doing the court stated:

We reject the trustee's argument that appellee's guarantee is not "new value" as defined by § 547(a)(2) because debtor's estate was not enhanced by the guarantee and was in fact depleted by payment to appellee. We are unable to accept the major premise of the trustee's argument which requires us to fracture this transaction into three separate, distinct and unrelated sub-transactions: first, the loan from Salween [the lender] to debtor and the concurrent debt owed by the debtor to Salween; second, appellee's guarantee to Salween and the preferential payment by debtor to appellee; and third, partial repayment of debtor's loan by appellee to Salween.

*Id.* In short, the court concluded that the trustee's argument failed to recognize the "brute fact of financial life" that the lender would not have made the loan to the debtor absent the personal guarantees. *Id.*[11]

The court also specifically rejected the trustee's position that the guarantees were analogous to forbearance agreements, finding that *Sider Ventures* was persuasive authority for its ruling. In *Sider Ventures,* the court, based upon the stipulation of the parties, determined that a lender would not have made additional loans absent guarantees. It also found that the guarantor in causing the lender to provide new money to the debtor provided money's worth in the form of a service by acting as a guarantor and in the form of new credit by virtue of increasing its guarantee exposure. 33 B.R. at 712 n. 2. *See*

---

11. The court stated the following:

The debtor was in a better position after the transaction because it had increased cash-flow. The particular guarantee from the appellee that increased the necessary cash-flow constituted new value to the debtor. Debtor's balance sheet was changed after he transaction, but the debtor's estate was not depleted as erroneously urged by the trustee. The debtor acquired $200,000 in cash from Salween with a concurrent $200,000 debt. The debtor paid appellees each $33,000 but with the payment was a concurrent retirement of debt in a like amount. Before the payment, the debtor's obligation to the appellee was a balance sheet entry of a liability; after payment, to be sure, an asset of $33,000 was depleted, but the liability of $33,000 also disappeared. *Id.*

also *In re Bellanca Aircraft Corp.*, 56 B.R. 339 (Bankr.D.Minn.1985), *aff'd, in relevant part,* 850 F.2d 1275 (8th Cir.1988). The court, without citing *Spada,* also rejected the trustee's argument that the value of the guarantees was too indeterminate in relation to the money received to satisfy § 547(c)(1).

This Court finds that the analysis by Judge Cowan in his dissenting opinion in *Kumar Bavishi* is well-reasoned and more compelling than the analysis set forth in the majority opinion. *See* Scott H. Brandt, *Bankruptcy—Personal Guarantee Constitutes New Value under Section 547(c)(1)— Reigle v. Mahajan (In re Kumar Bavishi & Associates),* 906 F.2d 942 (3d Cir.1990), 64 Temp. L.Rev. 1007 (1991). Noting that his research uncovered no case in which a guarantee was unequivocally held to be new value, Judge Cowan stated that the mere giving of a guarantee cannot be viewed as an advance of new credit and that even if it could be so viewed the defendants had failed to ascribe an independent value to their guarantor service. 906 F.2d at 948. He stated the following: "the court made no comparison of the relative values of the service and the preferential transfer. In fact, from the record before us it is clear that the Appellee utterly failed to offer proof as to the value of the alleged guarantor service provided to the debtor." *Id.* at 949.

▆ Turning to the specific facts of this case, the Court finds that Chace arguably provided the Debtor with new value when he subordinated his debt to equity, as opposed to merely forbearing from collecting the obligations owed to him by the Debtor. *See Trans World Airlines, Inc. v. Travellers International AG (In re Trans World Airlines, Inc.),* 180 B.R. 389, 403 (Bankr.D.Del. 1994)(new value exception does not apply to the forbearance from exercising a previously existing right); *Cocolat, Inc. v. Fisher Dev., Inc. (In re Cocolat, Inc.),* 176 B.R. 540, 548 (Bankr.N.D.Cal.1995)(release of a lien enlarges the estate; the elimination or release of unsecured claims against the estate does not similarly enlarge the estate or constitute new value). Chace's substitution of debt for equity can be analogized to the facts in *Spada.* The substitution of debt for equity can

be said to be more than "an obligation substituted for an existing obligation" because Chace sacrificed the terms and interest rate features of his existing loans for the mere potential to receive a distribution in the event the Debtor were liquidated and all outstanding current and long-term liabilities could be satisfied. *Cf.* 11 U.S.C. § 726. Thus, Chace's agreement as part of the Hanover restructuring to exchange debt for equity could be said to have augmented the Debtor's estate by reducing the Debtor's liabilities.

The problem with Chace's new value argument is similar to the one identified in *Spada* and by Judge Cowan in his dissenting opinion in *Kumar Bavishi.* Chace was unable to quantify the actual amount of new value his subordination produced except with reference to the advances made by Hanover. He attempted to tie his subordination to the credit provided by Hanover. However, this Court finds that any capital contribution made by Hanover or any credit extended to the Debtor by Hanover, although conditioned upon the conversion of existing debt to equity, cannot be attributed solely to Chace as new value because of the explicit language of § 547(c)(4). The monies made available to the Debtor by Hanover were in consideration of its acquisition of a 20% ownership interest in the Debtor as well as two positions on the nine-member Board of Directors. To establish subsequent new value as a defense to Gray's avoidance action, it was incumbent upon Chace to quantify what he gave up at the time of the restructuring—full, or most likely, partial payment of his outstanding loans, as compared with what, if anything, he would receive on his resulting equity investment. Chace made no attempt to engage in such an analysis. Accordingly, the Court finds that he has failed to satisfy his burden of proof of § 547(c)(4).

## V. CONCLUSION

In accordance with the foregoing, the Court hereby enters judgment in favor of the Creditors' Representative and against Chace on Counts I ($8,109.56), II ($14,689.86), IV ($5,648.04), and V ($66,645.00 and $335,-

000.00), and in favor of Chace and against the Creditors' Representative on Count III.